**WYOMING STATE TREASURER, as Statutory Trustee of the Firemen's Pension Fund, Appellant (Plaintiff below),**

v.

**CITY OF CASPER, Appellee (Defendant below),**

and

City of Cheyenne, (Defendant below).*

No. 4521.

Supreme Court of Wyoming.

June 22, 1976.

* Not a party to this appeal.

V. Frank Mendicino, Atty. Gen., and David A. Kern, Sr. Asst. Atty. Gen., Cheyenne, signed the brief and Lawrence A. Bobbitt, Special Asst. Atty. Gen., Cheyenne, appeared in oral argument on behalf of the appellant.

Hobart B. Harden, Jr., Harden & Harden, Casper, signed the brief and appeared in oral argument on behalf of the appellee.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

RAPER, Justice.

This case involves assessment procedures for the firemen's pension fund, followed by the appellant-plaintiff as its statutory trustee with respect to a claim against the appellee-defendant in the sum of $20,433.87 for its pro-rata share of a 1973–74 fiscal year deficiency.

The legislature of the State of Wyoming created a firemen's pension fund for the purpose of paying various awards, benefits and pensions to city, town and county fire fighters.[1] The fund is administered by the treasurer of the State of Wyoming through the Workmen's Compensation Department.[2] The plan is financed by various means: 50% of the gross annual tax collected upon fire insurance premiums, gifts, donations and contributions;[3] since the legislative session of 1975, 8% of

1. Section 15.1–303, et seq., W.S.1957, C.1965, as amended from time to time.

2. Section 15.1–304(a), W.S.1957, C.1965, as amended.

3. Section 15.1–304(b) and (c), W.S.1957, C. 1965, as amended.

the salary of every paid fireman is deducted monthly and paid into the fund;[4] an annual assessment share against cities, towns and counties based on a formula of benefit units[5] and interest on fund money invested in United States, state, county, district and municipal bonds.[6]

In 1973, the legislature established additionally a firemen's contingency fund to be maintained in an amount of $100,000.00 to be expended by the state treasurer as needed to pay unanticipated obligations of the firemen's pension fund.[7] It is established and maintained from the same sources as the firemen's pension fund; but principally from the city, town and county assessment.[8] It was an initial misunderstanding of the use of this fund by the

state treasurer that generated the dispute between the litigants. The facts are stipulated. We shall mention them as required.

Sections 15.1–305(b) and (c) require that prior to July 1 of each year, the state treasurer "shall" compute the amount of the annual assessment share of each city, town and county and prior to July 1 "shall" notify each entity of the assessment share computed, payable in 12 installments.[9] On July 24, 1973 for the 1973–74 fiscal year, the state treasurer computed the minimum annual cash requirements of the firemen's pension fund, computed the number of benefit units [10] attributable to each city, computed the value of a share,[11] computed the annual assess-

4. Section 15.1–305(a), W.S.1957, C.1965, as amended. At the time the action arose, it was 6%.

5. Sections 15.1–303(j), (o), (p) and 15.1–305 (b) and (c), W.S.1957, C.1965, as amended.

6. Section 15.1–304(c), W.S.1957, C.1965, as amended.

7. Section 15.1–303(k), W.S.1957, C.1965, as amended.

8. Sections 15.1–303(m) and (o) and 15.1–305 (b), W.S.1957, C.1965, as amended.

9. Section 15.1–305(b) and (c), W.S.1957, C. 1965, in effect in 1973, Ch. 231, S.L.Wyo. 1973, states:
"(b) Prior to July 1 of each year, the state treasurer shall compute the firemen's contingency fund assessment, compute the minimum annual cash requirements of the fund, compute the number of benefit units attributable to each city, town, and county, compute the value of a share, and determine the annual assessment share of each city, town and county.
"(c) Prior to July 1 of each year, the treasurer shall notify and assess each city, town or county with an annual assessment share so computed, and each such city, town or county shall transmit to the state treasurer on the first day of each month, beginning on July 1, 1973, 1/12 of such annual assessment share. If a city, town or county adds or begins a benefit unit during the fiscal year, such city, town or county shall pay an additional 1/12 of a share as computed at the beginning of the fiscal year, on the first day of each month during the fiscal year starting on the first of the month following the addition or beginning of such

benefit unit. If a city, town or county discontinues a benefit unit during the fiscal year, such city, town or county shall decrease its monthly payment by 1/12 of a share, as computed at the beginning of the fiscal year, starting on the first of the month following the discontinuance of such benefit unit. In any event, any assessment made under the provisions of this act shall not exceed $725 per benefit unit per year. The assessments in this subsection are in addition to the amount appropriated by section 15.1–304 of the statutes and the salary assessment of subsection (a) of this section."

10. Section 15.1–303(j), W.S.1957, C.1965, as amended:
"(j) 'Benefit unit' means each of the following:
"(i) Each paid fireman;
"(ii) Each person receiving a monthly pension under section 15.1–306 of the statutes;
"(iii) Each person receiving a disability pension under section 15.1–306 of the statutes;
"(iv) Each account of a deceased or retired fireman from which monthly pension payments are being made to any person or persons under sections 15.1–307 and 15.1–308 of the statutes."

11. Section 15.1–303(o), W.S.1957, C.1965, as amended, provides:
"(o) 'Share' means the sum of the minimum annual cash requirements of the fund and the firemen's contingency fund assessment, divided by the total benefit units in the state of Wyoming."

ment share [12] of each city, and assessed each city in accordance with those computations. The assessment will be here referred to as the original assessment. That original assessment was based on annual known total figures. Thereafter, during the 1973–74 fiscal year, the state treasurer discovered what he believed to be an erroneous use of cash from the firemen's contingency fund, as a back-up source to meet the monthly obligations of the firemen's pension fund which for several months during the fiscal year was essentially depleted. By the end of April, 1974, only $28,864.76[13] remained in the firemen's contingency fund and up to that time no unanticipated expenditures had arisen or been paid. The contingency fund was created by legislative fiat in 1973 to be used only for unanticipated expenditures, not known requirements. The reason for the fund being depleted was because the fire insurance tax money was not available for pension fund use until April, May and June, 1974.

About May 9, 1974, the state treasurer recomputed the minimum cash requirements of the firemen's pension fund and the firemen's contingency fund, recomputed the number of benefit units attributable to each city, recomputed the value of a share, recomputed the annual assessment share of each city as of July 1, 1973, for the fiscal year 1973–74 and reassessed each city in accordance with such computations. That assessment will be referred to as the reassessment.[14] The difference between the original assessment for the city of Casper and the reassessment comes to a claimed balance of $20,433.87, unpaid by

that city and for the recovery of which this suit was brought in the district court.

While all of the foregoing seems complex, it simply boils down to the proposition that the state treasurer is each year authorized and required to compute and assess each city for a pro-rata portion of the firemen's benefit and contingent fund requirements, after crediting other income sources. The original assessment did not take into consideration the months when the benefit fund was without money and the contingent fund was used. The reassessment was to make up that shortage.

The trial court held that the state treasurer had authority to assess cities, towns and counties prior to July 1 of each year with an annual assessment share. The trial court also held that the use of the firemen's contingency fund as a "back-up" fund is contrary to the terms of § 15.1–303(k). But it finally held that the state treasurer had no authority to assess or make a reassessment after July 1, 1973, for the fiscal year 1973–74, and specifically adjudged that the reassessment for the annual assessment made by the state treasurer on May 9, 1974, for the fiscal year July 1, 1973 to June 30, 1974, was made without statutory power to do so.

The district court apparently accepted the argument of the city of Casper made there and here that §§ 15.1–305(b) and (c) are mandatory as to date and that prior to July 1, the treasurer must compute and notify of the assessment for the ensuing fiscal year and he has no power thereafter in that fiscal year to recompute and reassess. In that connection, it was in the district court and is also urged here that the rea-

---

12. Section 15.1–303(p), W.S.1957, C.1965, as amended, provides:
 "(p) '*Annual assessment share*' means a share multiplied by the number of benefit units existing in a city, town or county being assessed, on July 1 of each fiscal year."

13. This figure is reconstructed from the exhibits before the district court and pertains to the reassessment by the state treasurer. In an appendix attached to the appellant-state

treasurer's brief, it is indicated that the lowest balance in the firemen's contingency fund was actually $34,961.00.

14. The cities of Laramie, Rawlins, Rock Springs and Sheridan paid the amount of the reassessment as to each. Cheyenne was originally a party to this action but while in the district court paid the reassessment and the cause was by stipulation dismissed as to it.

son for that deadline rests in §§ 9–533, as amended, and 9–535(c), W.S.1957, of the municipal budget act, then in effect, which makes it incumbent upon municipalities to prepare their budgets prior to the fiscal year commencing July 1, upon the basis of proposed expenditures. The tentative budget must be prepared by June 15 for hearings on the fourth Tuesday in July and adopted by at least the next day thereafter.[15] However, in fairness at this juncture it must be pointed out provision is made in the budget act for unanticipated expenditures as well. Sections 9–534(a) and 9–535(a)[16] provide for a cash reserve fund, within budget requirements, to maintain the municipality on a cash-operating basis and to meet unanticipated requirements. We opine this was the source from which Cheyenne, Laramie, Rock Springs and Sheridan were able to meet the unexpected expenditures required by the reassessment.

The issues, as expressed by counsel, are three: (1) Did the state treasurer have statutory authority to assess cities, towns and counties on a benefit unit basis? The city of Casper claims the state treasurer did not have authority to even make the original assessment. (2) If authorized, did the state treasurer accurately compute the original assessment? The city of Casper claims he did and there was no need for a reassessment, even if empowered. (3) Did the state treasurer have authority to recompute and reassess, nine months later, if the original assessment was erroneous? The state treasurer claims this to be the only question.

The state treasurer, understandably, would not complain about the trial court's favorable findings that the treasurer had authority to assess and that the original assessment was erroneous. The city of Casper did not cross-appeal those parts of the judgment favorable to the treasurer, as provided by Rule 73(a)(2), W.R.C.P., in proper cases, giving added time of 14 days to do so following an appellant's notice of appeal. The state treasurer claims that the city of Casper in order to attack the trial court's judgment must cross-appeal.

It is apparent then that if the state treasurer had either no authority at all at any time to assess on a benefit unit basis or its original assessment was correct, there would be no need for this court to make a determination of the issue as to whether or

15. Section 9–533, W.S.1957, as amended:
 "(a) The budget officer shall by June 15th of each year submit to the governing board of the municipality a schedule of the proposed expenditures for the ensuing fiscal year, showing both the amounts requested by the departments, and his recommendations therewith. The board shall consider the proposed expenditure schedule, and shall make such alterations as it may deem necessary. A summary of the tentative budget shall be entered upon the minutes of the governing board of the municipality. Hearing for county budgets shall be held the fourth Monday in July; for city budgets the fourth Tuesday in July; * * *
 "(b) Except as hereinafter provided the summary of the budget shall be published once in a daily or weekly newspaper having general circulation in the county or counties in which the municipality is located. Such publication shall be made in the first regular issue of the designated newspaper appearing on or after the 14th day of July or at least one week before the hearing. After the public hearing on that day or the day following, the governing board of the municipality, * * *"
 Section 9–535(c), W.S.1957:
 "* * * The governing board shall certify to the board of county commissioners in writing not later than the 31st day of July the amount of money necessary to be raised by tax levy to finance the budget as finally adopted. * * *"

16. In pertinent part, those sections provide as follows:
 Section 9–534(a): "* * * Monies of the cash reserve fund shall be available as working capital to maintain the municipality upon a cash-operating basis during periods of the fiscal year when current revenue collections are insufficient to meet current operating costs."
 Section 9–535(a): "* * * It shall be the purpose of this fund to maintain the municipality or institution upon cash-operating basis, and to meet unforseeable contingencies or emergencies not contemplated at the time of the budget adoption. * * *"

not the state treasurer had authority after July 1 to recompute and reassess. This raises an intermediate question. Before this court can consider issues one and two, must the city of Casper have cross-appealed from those findings of the district court favorable to the state treasurer?

 The controlling rule has been settled for many years. In *United States v. American Railway Express Co.*, 1924, 265 U.S. 425, 435, 44 S.Ct. 560, 564, 68 L.Ed. 1087,1093, it was said:

"* * * [A] party who does not appeal from a final decree of the trial court cannot be heard in opposition thereto when the case is brought here by the appeal of the adverse party. In other words, the appellee may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below. But it is likewise settled that the appellee may, without taking a cross appeal, urge in support of a decree any matter appearing in the record although his argument may involve an attack upon the reasoning of the lower court, or an insistence upon matter overlooked or ignored by it. * * *"

In summary, a non-appealing party may not attack the ultimate effect of the judgment below but may support it by any matter appearing in the record. The rejection of a contention, argument or theory in support of a claim does not reject the final upholding of the claim itself. A party need not cross-appeal in order to support a claim allowed in the district court by urging the validity of a contention, argument or theory specifically rejected by the trial judge as a basis for its allowance of the claim. *Anderson v. Atherton*, 1937, 302 U.S. 643,

58 S.Ct. 53, 82 L.Ed. 500; *Jaffke v. Dunham*, 1957, 352 U.S. 280, 77 S.Ct. 307, 1 L. Ed.2d 314.[17] Such is the situation here. If the state treasurer had no authority to at any time assess or the original assessment was correct, either conclusion supports the trial court's ultimate judgment for the defendant, city of Casper. They will therefore be considered proper issues here.

The first claim of the city of Casper that the State had no authority to compute and assess the annual assessment share based on benefit units, is grounded upon a conflict created by the Wyoming state legislature in 1973, which can only be explained by setting out in detail what it did. By § 1, Chapter 231, Session Laws of Wyoming, 1973, the following statutory sections were amended to read:

"15.1–304(a). There is hereby created a 'firemen's pension fund' and a 'firemen's contingency fund' for the purpose of paying the awards, benefits and pensions under the provisions of this division. These funds shall be administered by the state treasurer through the workmen's compensation department of Wyoming. The treasurer has full custody and control of these funds with full power over their administration. The treasurer has full power to make assessments on each city, town or county having a benefit unit or units and shall implement an annual study of the funds to determine the annual assessment share of each city, town or county having benefit units. The state examiner shall make an annual audit of both funds and the receipts thereto and disbursements therefrom and report his findings to the governor. Both funds shall be administered without liability on the part of the state beyond the amount of the funds. All expenses of administration of both

17. We use these federal cases because our Rule 73(a)(2), W.R.C.P., had its genesis in an identical federal rule. For a full coverage of the rule, see 9 Moore's Federal Practice, p. 932, discussing Rule 4(a), Federal Rules of Appellate Procedure, formerly Rule 73(a), Federal Rules of Civil Procedure, identical to Rule 73(a), W.R.C.P., with respect to cross-appeals.

funds shall be paid from the firemen's contingency fund."

"15.1–305. (a) In addition to the amount appropriated to the firemen's pension fund by section 15.1–304 of the statutes, every paid fireman shall be assessed 6% of his gross salary monthly for the use and benefit of the fund, up to the maximum salary of a fireman first class. The salary assessment shall be withheld monthly from his salary by the treasurer or other disbursing officer of the city, town, or county. The salary assessments shall be transmitted to the state treasurer on the first day of the month following such monthly withholding.

"(b) Prior to July 1 of each year, the state treasurer shall compute the firemen's contingency fund assessment, compute the minimum annual cash requirements of the fund, compute the number of benefit units attributable to each city, town, and county, compute the value of a share, and determine the annual assessment share of each city, town and county.

"(c) Prior to July 1 of each year, the treasurer shall notify and assess each city, town or county with an annual assessment share so computed, and each such city, town or county shall transmit to the state treasurer on the first day of each month, beginning on July 1, 1973, ¹⁄₁₂ of such annual assessment share. If a city, town or county adds or begins a benefit unit during the fiscal year, such city, town or county shall pay an additional ¹⁄₁₂ of a share, as computed at the beginning of the fiscal year, on the first day of each month during the fiscal year starting on the first of the month following the addition or beginning of such benefit unit. If a city, town or county discontinues a benefit unit during the fiscal year, such city, town or county shall decrease its monthly payment by ¹⁄₁₂ of a share, as computed at the beginning of the fiscal year, starting on the first of the month following the dis-

continuance of such benefit unit. In any event, any assessment made under the provisions of this act shall not exceed $725 per benefit unit per year. The assessments in this subsection are in addition to the amount appropriated by section 15.1–304 of the statutes and the salary assessment of subsection (a) of this section."

By § 3, Chapter 245, Session Laws of Wyoming, 1973, the same sections with respect to firemen's pensions omitted reference to assessment of cities and towns having benefit units by the state treasurer and were differently amended to read:

"15.1–304. (a) There is hereby created a firemen's pension account within the trust and agency fund for the purpose of paying the awards, benefits and pensions under the provisions of this division. This account shall be administered by the state treasurer, through the workmen's compensation department of Wyoming. The treasurer has full custody and control of the account with full power over its administration and shall comply with the provisions of sections 9–504 to 9–524, Wyoming Statutes, 1957, as amended, relating to budgets. The state examiner shall make an annual audit of the firemen's pension account and the receipts thereto and disbursements therefrom and report his findings to the governor. The account shall be administered without liability on the part of the state beyond the amount of the fund.

"(b) Fifty percent of the gross annual tax collected upon the fire insurance premiums paid to fire insurance companies within the state as provided by law, is hereby set aside and appropriated for the use and benefit of the account. That amount of tax shall be credited to the account by the state treasurer upon payment of the tax to him by the insurance commissioner.

"(c) The state treasurer is hereby empowered to receive and credit to the account any and all gifts, donations and contributions as may be made by individ-

uals and organizations for the benefit of the account. The state treasurer is hereby empowered and authorized to invest all account monies not immediately necessary for disbursements in United States government bonds, state, county, district, and municipal bonds.

"15.1–305. In addition to the amount appropriated to the account by section 15.1–304, every paid fireman shall be assessed 6% of his salary monthly for the use and benefit of the account, up to the maximum monthly salary of a fireman first class. The assessment shall be withheld monthly from his salary by the treasurer or other disbursing officer of the city, town or county, and to further maintain this account, each city, town or county employing fulltime paid firemen shall contribute annually to the account an amount equal to not less than sixtenths of one mill, nor more than one mill, on all assessed property therein, as required to meet the demands of the account. The monthly assessments shall be transmitted to the state treasurer on the first day of each month."

The 1973 Digest of the House Journal, p. 885, shows that the house enrolled act of Chapter 231, Session Laws, 1973, was signed by the speaker of the house and the president of the senate on February 23, 1973. The 1973 Digest of the Senate Journal, p. 189, shows the senate enrolled act of Chapter 245, Session Laws, 1973, was signed by the president of the senate and speaker of the house on February 24, 1973. The governor approved Chapter 231 on March 5, 1973, and Chapter 245 on March 8, 1973. Chapter 231 became effective on July 1, 1973. Chapter 245 carried a stated effective date of July 1, 1973. While § 5, Chapter 245, repealed a number of statutory sections, it did not repeal those which the legislature had amended by Chapter 231, only the day before.

What the legislature did was a clear case of the right hand not keeping track of what the left hand was doing. The sole purpose of Chapter 245 is expressed in the legislature's statment of purpose that it was:

"AN ACT * * * [consolidating state funds], creating authorized funds; requiring that money derived from certain sources be deposited in certain funds; abolishing certain existing funds and providing for transfer of money therein to specified funds; providing procedures for receiving and disbursing money from state funds; defining requirements for creating or abolishing funds; and providing an effective date."

The Act was by § 1, Chapter 245, to "be known and may be cited as the 'Funds Consolidation Act of 1973.' "

The firemen's pension fund was with other funds consolidated into the "trust and agency fund," to be used "to account for money which the state administers as a trustee pursuant to law or trust agreement which restricts the use of the money to a specified purpose, and for money which the state holds and disburses as an agent." [18]

As can be seen, the purposes of Chapters 231 and 245 were entirely different. Chapter 231 was concerned with the detail of administering the trust funds relating to firemen's pensions and Chapter 245 was concerned only with state fund consolidation. The Michie Company, compiler of the Wyoming Statutes, in the 1975 Cumulative Supplement by its footnotes to §§ 15.1–304 and 15.1–305, noticed this 1973 conflict and states that, "Both amendments have been given effect * * * in this Supplement." The sections as found in Chapters 231 and 245 have been blended together in the 1975 Cumulative Supplement and appear as follows:

"§ 15.1–304. (a) There is hereby created a firemen's pension account and a

---

18. Section 9–557.3(d), W.S.1957, as amended was created by § 1, Chapter 245, Session Laws of Wyoming, 1973.

firemen's contingency fund [account] within the trust ard agency fund for the purpose of paying the awards, benefits and pensions under the provisions of this division. These account [accounts] shall be administered by the state treasurer through the workmen's compensation department of Wyoming. The treasurer has full custody and control of the account [accounts] with full power over their administration. The treasurer has full power to make assessments on each city, town or county having a benefit unit or units and shall implement an annual study of the funds to determine the annual assessment share of each city, town or county having benefit units. The state examiner shall make an annual audit of both accounts and the receipts thereto and disbursements therefrom and report his findings to the governor. Both accounts shall be administered without liability on the part of the state beyond the amount of the funds. All expenses of administration of both funds shall be paid from the firemen's contingency fund [account].

"(b) Fifty percent of the gross annual tax collected upon the fire insurance premiums paid to fire insurance companies within the state as provided by law, is hereby set aside and appropriated for the use and benefit of the account. That amount of tax shall be credited to the account by the state treasurer upon payment of the tax to him by the insurance commissioner.

"(c) The state treasurer is hereby empowered to receive and credit to the account any and all gifts, donations and contributions as may be made by individuals and organizations for the benefit of the account. The state treasurer is hereby empowered and authorized to invest account monies not immediately necessary for disbursements in United States government bonds, state, county, district and municipal bonds.

"§ 15.1–305. (a) In addition to the amount appropriated to the firemen's pension account by W.S. 15.1–304, every paid fireman shall be assessed eight percent (8%) of his gross salary monthly for the use and benefit of the account, up to the maximum monthly salary of a fireman first class. The salary assessment shall be withheld monthly from his salary by the treasurer or other disbursing officer of the city, town, or county. The salary assessments shall be transmitted to the state treasurer on the first day of the month following the monthly withholding.

"(b) Prior to July 1 of each year, the state treasurer shall compute the firemen's contingency fund assessment, compute the minimum annual cash requirements of the fund, compute the number of benefit units attributable to each city, town, and county, compute the value of a share, and determine the annual assessment share of each city, town and county.

"(c) Prior to June 1 of each year, the treasurer shall notify and assess each city, town or county with an annual assessment share so computed, and each such city, town or county shall transmit to the state treasurer on the first day of each month, beginning on July 1, 1973, one-twelfth ($\frac{1}{12}$) of such annual assessment share. If a city, town or county adds or begins a benefit unit during the fiscal year, such city, town or county shall pay an additional one-twelfth ($\frac{1}{12}$) of a share, as computed at the beginning of the fiscal year, on the first day of each month during the fiscal year starting on the first of the month following the addition or beginning of such benefit unit. If a city, town or county discontinues a benefit unit during the fiscal year, such city, town or county shall decrease its monthly payment by one-twelfth ($\frac{1}{12}$) of a share, as computed at the beginning of the fiscal year, starting on the first of the month following the discontinuance of such benefit unit. The assessments in this subsection are in addition to the amount appropriated by W.

S. 15.1–304 and the salary assessment of subsection (a) of this section." [19]

The compiler in doing so has followed concepts we approve. In construing statutes, the intention of the lawmaking body is to be ascertained as nearly as possible. *Lichty v. Lichty Construction Co.*, 1952, 69 Wyo. 411, 430, 243 P.2d 151, 159. That intent must be found in the language of the statute itself. *Mahoney v. L. L. Sheep Company*, 1958, 79 Wyo. 293, 302, 333 P.2d 712, 715. It is fundamental that a statute must be viewed in the light of the objects and purposes to be accomplished. *School Districts Nos. 2, 3, 6, 9, and 10, in Campbell County v. Cook*, Wyo., 1967, 424 P.2d 751, 756.

▆▆▆ Statutes which are passed at the same session of the legislature, relating to the same subject matter, are to be construed together in pari materia, especially if they were to take effect on the same day. 2A Sutherland on Statutory Construction, Sands' 4th Ed., § 51.03, p. 299. Where two statutes are in apparent conflict, they should be so construed, if reasonably possible, as to allow both to stand and give force and effect to each. *City of Casper v. Joyce*, 1939, 54 Wyo. 198, 218, 88 P.2d 467, 473. The combination of the rules set out indicate that each of the chapters had different objects and purposes and are not in any real conflict with each other. We hold that the state treasurer had authority to compute and assess cities, towns and counties on the basis of benefit units.

We now turn to the question of whether or not the state treasurer made an erroneous computation of the original assessment. We must first look at the statutory definitions of the "minimum annual cash requirement" and "firemen's contingency fund" because they direct what the treasurer must have on hand to meet the monthly payment of awards, benefits and pensions. It is from those figures that he determines the amount that must be assessed against each city after deducting other income, viz., insurance tax, contributions by firemen and interest on invested funds. Section 15.1–303(n), in effect in 1973, and still in effect, states:

> " 'Minimum annual cash requirement of the *fund*' means the amount of cash needed to meet the known required disbursements from the firemen's pension fund during the upcoming fiscal year, reduced by the anticipated cash fund balance of the firemen's pension fund, excluding the firemen's contingency fund, on hand at the end of the current fiscal year." (Underscoring added.)

The starting balance and cash flow into the fund was not constant during the course of the year so that there were times during the first nine months of the fiscal period 1973–74 when there was no money in the *firemen's pension fund* to pay awards, benefits and pensions as they came due. The treasurer then during those months used money out of the *firemen's contingency fund* to pay those regular anticipated (known) expenditures. Such a use of the contingency fund is not proper because § 15.1–303(k), then and still in effect, specifically mandates:

> " 'Firemen's contingency fund' means a separate and distinct cash fund, in the amount of $100,000, plus all accrued interest to be expended by the state treasurer as needed to pay unanticipated obligations of the firemen's pension fund." (Underscoring added.)

The treasurer noticed sometime during the fiscal year 1973–74 that under those two statutory definitions that he had not levied a sufficient assessment to meet *known* expenditures and apparently mistakenly believed that the contingency fund gave him a back-up fund from which he could pay *known* expenditures during the dry months when the pension fund was de-

---

19. The only 1975 changes in this section were to increase the fireman's salary assessment from 6% to 8% and remove a $725.00 limitation on the annual assessment share. § 15.1–305, W.S.1957, as amended, Session Laws, 1975, Ch. 144.

pleted. The very language of the statutory provisions is clear that the contingency fund is not to be touched except for unanticipated expenditures.

In order to rectify his mistake, he made the reassessment in order to restore the contingency fund to the required statutory $100,000.00 balance and provide money for a continuing cash flow for payment of pensions during the balance of the year. The assessment for the 1973–74 fiscal year should have been in an amount to assure an adequate monthly balance to meet known, anticipated expenditures for every month so that there would be no months during which the firemen's pension fund would be exhausted. Even though at the end of the fiscal year there might be an unexpended balance, the cities would not suffer, because under § 15.1–303(n), set out in full above, the "known required disbursements" for the upcoming year would be "reduced by the anticipated cash fund balance * * * on hand at the end of the current fiscal year." The record does not show the assessment made for the fiscal year 1974–75 so we do not know whether it showed an assessment based upon an included year-end balance, taking into consideration cash derived or to be derived from the reassessment. If included, the 1974–75 assessment would be less than if the original 1973–74 assessment were permitted to stand.

■■■ We hold that the clear language of the statutory provisions demonstrates that the original assessment was not proper. Where the language of a statute is plain, unambiguous and conveys clear and definite meaning, there is no occasion for resorting to rules of statutory construction, and the court has no right to look for and impose another meaning. *Geraud v. Schrader*, Wyo., 1975, 531 P.2d 872, 878, cert. den. *Wind River Indian Education Association, Inc. v. Ward*, 423 U.S. 904, 96 S.Ct. 205, 46 L.Ed.2d 134. The original assessment failed to take into account those months when the pension fund

would be depleted and the state treasurer erroneously used contingency fund monies. Casper would suffer no loss by payment of the reassessment because any surplus at the end of the fiscal year would be credited for the upcoming year.

Since the city of Casper can obtain no comfort from the issues it raised, we must now explore the issue as to whether or not the state treasurer could in May, 1974, correct the erroneous original assessment. This question is really: Is the statutory requirement that "prior to July 1" the state treasurer compute and assess, mandatory or directory?

The arrangement of the language is revealing. The command "shall" does not go to the date but goes to the duty to be performed by the state treasurer. "Prior to July 1 of each year, the state treasurer shall compute * * *." "Prior to July 1 of each year, the state treasurer shall notify and assess * * *." The significant emphasis is upon the requirement that the treasurer take the steps necessary to collect the money required to generate a firemen's benefit fund and a firemen's contingency fund. The language makes it at least mandatory that the state treasurer compute and assess.

■■■ It is a universal holding that a statute specifying a time within which a public officer is to perform an official act regarding the rights and duties of others is directory, unless the nature of the act to be performed, or the phraseology of the statute is such that the designation of time must be considered as a limitation of the power of the officer. *Application of Goodrich*, 1937, 51 Wyo. 463, 470, 68 P.2d 597, 600; *Horse Creek Conservation District v. Lincoln Land Company*, 1936, 50 Wyo. 229, 237, 59 P.2d 763, 765.

*Goodrich* is particularly applicable because the statutory phraseology is identical. There, the statutory language in question was: "Within ten (10) days thereafter the clerk of said court shall serve * * *." For that and other reasons, the court held

the time limit directory and it in no wise limited the officer's power to serve them late and, in fact, to not do so would abort the legislative purpose. A more dramatic example would exist if the state treasurer had made no original assessment at all. It could hardly be said that the firemen's pension and contingency funds must then become insolvent. As a matter of fact, the original assessment was not made until July 24, 1973. The city of Casper made no objection to that late computation and assessment.

■ Likewise, here, to not permit the state treasurer to perform his statutory obligation of maintaining the firemen's pension fund and the firemen's contingency fund at the statutory levels would abort the legislative purpose. The funds are for the benefit of the firemen as a matter of public policy declared by the legislature. The obligation of supporting the fund in part is upon the city. It would be unreasonable to subordinate the interests of the firemen's trust funds to the mere administrative interests of the city and evade the statutory purpose. The manner of performing is not essential to the purpose of the statute and not of essence to the thing to be done.

■ ■ There is yet another reason. 1A Sutherland on Statutory Construction, Sands' 4th Ed., § 24.03, p. 299, states:

> "* * * if the statute is merely a guide for the conduct of business and for orderly procedure rather than a limitation of power, it will be construed as directory only."

The guide relates to the fact that it would be a matter of good government business for cities to know within a time before budget preparation what expenditures will be required during the ensuing year. Sections 9–533(a), as amended, and 9–535(c), W.S.1957, C.1965, set out in footnote 15.[20] Provision must be made by municipalities

for a cash reserve fund to meet unanticipated expenditures; they do arise and such expenditures are expected, however unwelcome they may be.

■ Another aid to construction is in the rule that an affirmative statutory provision relating to the time of performing official acts, unlimited or unqualified by negative words, is generally considered as directory rather than mandatory. *Horse Creek Conservation District v. Lincoln Land Company*, supra; *Allen v. Lewis*, 1919, 26 Wyo. 85, 97, 177 P. 433, 436. In the converse, it is said in 2A Sutherland on Statutory Construction, Sands' 4th Ed., § 57.09, pp. 425–426:

> "One of the strongest indications as to what construction should be given to a statutory provision may be found in the use of negative, prohibitory, or exclusionary words. Where statutory restrictions are couched in negative terms they are almost invariably held to be mandatory. In the language of one court 'there is but one way to obey the command "thou shalt not," and that is to refrain altogether from doing the forbidden act.' "

There are no negative prohibitions in the statutes we are considering, either as to time or performance.

■ ■ We hold that the time provisions of §§ 15.1–304 and 15.1–305 were and are directory and the state treasurer not only was authorized but was compelled to carry out his statutory duty of recomputing and reassessing the city of Casper for its annual assessment share for the firemen's pension fund and the firemen's contingency fund, even though nine months following the time directed by statute.

Reversed and remanded to the district court with directions to vacate its judgment for the defendant and enter judgment for the plaintiff.

---

20. However, notice that in § 9–533(a) the municipal budget officer is required to prepare his schedule of proposed expenditures by *June 15*. In 1975, the Wyoming legislature changed the annual assessment share date to "Prior to *June 1*," S.L., 1975, Ch. 144, § 1, amending § 15.1–305(c), W.S.1957, C.1965.