Barbara YATES, Appellant (One of Petitioners below),

v.

STATE COMMITTEE ON SCHOOL DISTRICT ORGANIZATION, State of Wyoming, Appellee (Respondent below).

No. 5047.

Supreme Court of Wyoming.

July 13, 1979.

Ross D. Copenhaver, of Ross D. Copenhaver, P. C., Powell, for appellant.

John D. Troughton, Atty. Gen., and Mary B. Guthrie, Asst. Atty. Gen., Cheyenne, for appellee.

Before RAPER, C. J., McCLINTOCK, THOMAS and ROSE, JJ., and MAIER, D. J.*

ROSE, Justice.

Barbara Yates comes here on appeal from a Big Horn County, Wyoming, District Court decision which affirmed a May 27, 1977, Decision and Order of the appellee, State Committee on School District Organization.

On May 27, 1977, the State Committee on School District Organization (hereinafter "State Committee") entered an Order, subsequently approved by the district court, approving a resolution of the Big Horn County Planning Committee (hereinafter "County Committee"). The County Committee's resolution provided for alteration of school district boundary lines within the Big Horn County School District. The purpose of the resolution was to give effect to the State Committee's plan under which the schools in Big Horn County had been organized, which plan called upon the County Committee to annually equalize the districts based upon the assessed valuation per pupil ADM.[1]

Because the County Committee had originally failed to submit an acceptable plan of school organization as of December 1, 1971, as required by Chapter 5 of the Wyoming Education Code of 1969, S.L.1969, ch. 111 [§§ 21.1–105 through 21.1–135, W.S.1957, 1975 Cum.Supp. (now §§ 21–5–101 through 21–5–137, W.S.1977)], the State Committee, pursuant to the predecessor of § 21–5–109, W.S.1977, formulated a plan which reorga-

---

* MAIER, D. J., was assigned to sit for ROONEY, J., who recused himself.

1. "ADM" is referred to in § 21–5–105(v), W.S. 1977, as follows:

"(v) In developing plans of organization, the county committees shall consider a ratio of *average daily membership* to assessed valuation as nearly equalized as practicable among the unified districts in the various counties; . . . ." [Emphasis supplied]

nized and unified the Big Horn County schools. This November 2, 1973, plan of organization addressed a variety of issues, among which were the following:

(a) Boundaries of each district,

(b) delineation of trustee residence areas,

(c) number of trustees from each district,

(d) distribution of assets held by school districts in existence before reorganization,

(e) payment of contract and bonded indebtedness, whether current or to be incurred in the future,

(f) collection and allocation of taxes;

(g) employment of existing personnel;

(h) operation and maintenance of schools;

(i) transportation routes and bussing; and

(j) inclusion of Park County lands in Big Horn County School District.

The State Committee's Decision and Order contained a provision dealing with equalization of assessed valuation per pupil ADM, according to which the County Committee was charged with meeting prior to January 1, 1975, for the purpose of more equitably adjusting the assessed valuation among the four school districts created by the State Committee's plan.

A petition for review of the November 2, 1973, Decision and Order was filed in Big Horn County, after which the parties stipulated with respect to their differences, whereupon, on August 8, 1974, the State Committee issued its Decision and Order amending and modifying the organization plan presented in the November 2, 1973, Decision and Order. The August 8, 1974, Order covered the same topics as did the Order of November 2, 1973.

While most of the modifications of the original plan contained in the amended Decision and Order were made as the result of changes in assessed valuation and enrollment in the schools in Big Horn County, a significant change was made regarding equalization. The November, 1973, Decision and Order had required the County Committee to meet before January 1, 1975, to adjust assessed valuation to per pupil ADM. The August, 1974, Decision and Order in ¶ 46, directed and ordered the County Committee to meet *on an annual basis* in order to equalize the assessed valuation per pupil ADM.[2]

Two petitions for review of the August 8, 1974, Decision and Order of the State Committee were filed in Big Horn County District Court (Civil Nos. 11489 and 11491). On December 9, 1974, the District Court entered an order, based on stipulation of the parties, approving and confirming the school organization plan for Big Horn County, as provided for in the State Committee's Decisions and Orders of November 2, 1973, and August 8, 1974, and requiring certain additional amendments. The civil actions were, therefore, dismissed with prejudice as to all parties.

GENESIS OF THIS CONTROVERSY

The present controversy had its genesis on February 15, 1977, when the boards of trustees of school districts in Big Horn County met, as the County Committee, and resolved that the assessed valuation per pupil ADM should be equalized by changing the existing boundaries of the school districts. This resolution contained the express recognition that this action was governed by the August 8, 1974, dictates of ¶ 46 of the State Committee's Decision and Order (fn. 2, supra).

A public hearing concerning the proposed changes in existing boundaries, as provided for in the February 15, 1977, resolution of the County Committee, was held in Lovell, Wyoming, on March 3, 1977, and testimony of interested residents of Big Horn County was received and recorded.

2. Paragraph 46 of the Decision and Order of the State Committee, August 8, 1974, reads: "The boards of trustees of Big Horn County School Districts Nos. 1, 2, 3, and 4 pursuant *to their duties as the Big Horn County Planning Committee, shall* meet before September ber 1 of each year, beginning on September 1, 1975, to equalize the assessed valuation per pupil ADM as much as practicable among all school districts in Big Horn County." [Emphasis supplied]

The State Committee approved the County Committee's resolution in its Decision and Order of May 27, 1977, which contained the following conclusion of law:

"1. That the Big Horn County Planning Committee is authorized to submit to the State Committee a plan proposing further school district organization in Big Horn County, pursuant to a Decision and Order dated August 8, 1974, and W.S. 21.1–134, and that the State Committee is authorized to approve said plan pursuant to W.S. 21.1–112(a)."

The State Committee's Decision and Order of May 27, 1977, reciting that its purpose was "to alter the boundary lines for School Districts 1, 2, 3 and 4, Big Horn County, Wyoming," was filed with the Clerk of Big Horn County, Wyoming, on May 31, 1977, and, on June 9, 1977, the appellant filed a petition for review in the District Court in Big Horn County. On August 3, 1978, the district court affirmed the May 27, 1977, Decision and Order of the State Committee.

By these decisions and orders, the posture in which the Big Horn County School districts found themselves was this:

(1) Under the State Committee's Order of August 8, 1974, and the court's approval of December 9, 1974, the County Committee was bound to undertake an annual equalization assessment of all the school districts in the county, with resultant boundary-line changes whenever the assessed valuation based upon per-pupil per ADM appeared unequal.

(2) This annual equalization and resultant boundary-changing exercise was to be undertaken by the County Committee under orders of the State Committee and the court without consideration of any other reorganization criteria such as is contained in § 21–5–105, W.S.1977 [formerly § 21.1–109, W.S.1957, 1975 Cum.Supp.], which provides for:

(a) Consideration of "the education, convenience, and welfare of the children;" and directs that plans of organization must include

(b) provisions for "educational opportunity and services as nearly equal as possible in all areas of each unified district."

(3) The annual equalization effort was to have the effect of ignoring the boundary-board statutes [§§ 21–6–101 to 21–6–115, W.S.1977 (formerly §§ 21.1–136 to 21.1–150, W.S.1957, 1975 Cum.Supp.)], and the local boundary board's authority to recommend boundary-line changes within districts of a unified district when, in the judgment of the board, such change would be

"for the benefit of the educational needs of the pupils . . . ." § 21–6–105, W.S.1977 [formerly § 21.1–140, W.S.1957, 1975 Cum.Supp.].

(4) Except as it provides for the reduction of disparity in the per-pupil valuation among school districts, the State Committee's equalization plan was to ignore other announced purposes of the Wyoming School District Organization Law, namely, the more equalized opportunity for all pupils of the state (except as money is this directive's only criteria) and the allowance of planning *"to be conducted on the local level."* § 21–5–102, W.S.1977 [formerly § 21.1–106, W.S. 1957, 1975 Cum.Supp.]. (Emphasis supplied)

The issues for our consideration are:

I

Did the State Committee act in conformity with law when it directed the County Committee to equalize the school districts under the State Committee's ¶ 46 of the State Committee's Order of August 8, 1974 (fn. 2, supra)?  and

II

Did the County Committee act in conformity with law when it undertook to carry out the directives of the State Committee's Order of August 8, 1974?

We will hold in the negative on both issues and reverse the trial court.

By the State Committee's Order of August 8, 1974, redistricting the schools of Big Horn County (which order was approved by the district court), it became the duty of the

County Committee to meet on or before September 1 of each year, beginning September 1, 1975, to

> "equalize the assessed valuation per pupil ADM as much as practicable among all school districts in Big Horn County."

It appears, however, that the County Committee did not meet for this purpose until 1977. According to the record and appellee's brief, the State and County Committees, together with the court itself, viewed this function purely and simply as a boundary-line-changing exercise for equalization purposes[3] authorized under § 21-5-130, W.S.1977 [formerly § 21.1-134, W.S.1957, 1975 Cum.Supp.],[4] and § 21-5-108(a)(i), W.S.1977 [formerly § 21.1-112(a), W.S.1957, 1975 Cum.Supp.], having no relationship to the statutory reorganization duties assigned to county committees under § 21-5-114, W.S.1977 [formerly § 21.1-118, W.S.1957, 1975 Cum.Supp.]. The appellant, on the other hand, urges that, since the State Committee had reorganized the county and it has become a unified district, the only authority the County Committee had in the premises was to function under § 21-5-130, supra, which as appellant interprets that statute, is to mandatorily impose upon the County Committee the precisely delineated power to actually originate the reorganization of county school districts, with the consequent change of boundary lines, as contemplated by the criteria requirements contained in § 21-5-114, supra. It is also the position of the appellant that since the reorganization had in fact been accomplished by the State Committee's plan—there being no residual authority in the State Committee to direct the County Committee to undertake yearly equalization proceedings—the only body with boundary-line-changing jurisdiction (absent a submission by the County Committee to the State Committee of a full reorganization plan under § 21-5-130, supra), was the District Boundary Board under §§ 21-6-101 through 21-6-115, supra.[5]

What are the powers of the State and County Committees as they pertain to the

3. At the public hearing of March 3, 1977, this exchange took place between attorney Copenhaver, representing appellant, and Mr. Hammons of the Board:

> "*COPENHAVER:* It appears then that what you have done is made a boundary change and you haven't actually reorganized any district as such, have you?
> "*HAMMONS:* There has not been reorganization as such of districts; it has merely been a boundary change."

4. Appellee's brief says: "On-going authority for the County Committee to act is contained in W.S. 21-5-130 (1977)."

5. At the public hearing of March 3, 1977, the attorney for appellant said:

> "*COPENHAVER:* All right, then, let me for the record, make the following statement. Insofar as I understand you have acted under the provisions of the authority of your committee under Section 21.1-134 of the Wyoming Statutes which provide that the committee, which is your county committee all together, shall constitute a committee with the powers and duties of the former original county reorganization committee, and the committee shall submit to the state committee plans proposing organization of school districts which conform to criteria and the procedures set forth in this chapter with the time limits provided do not provide [sic]. Now this chapter to which that refers is rather explicit in the things which need to be done using the word 'shall' in many cases, which includes such things as 'shall prepare and submit plans of organization' and the definition of organization provides for the combining of of [sic] two or more school districts of the sub-division of two or more school districts. It also provides that when this committee acts, it 'shall provide a date for the election of new trustees' and it 'shall provide for the transfer of assets and indebtedness,' and that when the new plan is effective, the existing trustees shall cease to act as such, and newly elected trustees shall take over the trustees, and there 'shall be a date for an election set' all of which is a part of the plan this committee is to undertake. Now if this is a boundary change, there is a provision in the law that very specifically allows for a boundary change, and that is the district boundary board. They are specifically charged by law to alter and change the boundaries of any school district of any kind. And that is the provision of law under which nothing but boundary change is to be effected, and I submit therefore, that this particular committee either must go about this in some other way or if it's a boundary change that's desired, it should be done by the boundary board and the provisions and the provisions [sic] of the law providing for a boundary board."

facts of this case? At the outset—both parties argue that § 21–5–130 is applicable.[6] (Appellee's brief, supra, and attorney Copenhaver's remarks, fn. 5, supra). The appellee's position is that § 21–5–130 furnishes ongoing authority for the County Committee to submit a yearly equalization plan to the State Committee, and the State Committee has authority *to approve the plan* under § 21–5–108, W.S.1977 [formerly § 21.1–112, W.S.1957, 1975 Cum.Supp.] The appellant says, yes, this section (§ 21–5–130) furnishes authority for the County Committee to submit plans to the State Committee, but they must be plans

"proposing *organization of school districts* which conform to the criteria and procedures set forth in this chapter . . . ." [Emphasis supplied] (Having reference here to the criteria set out in § 21–5–104, formerly § 21.1–108),

and the equalization plan in question here was not such an organization plan as was contemplated by § 21–5–130.

Section 21–5–130, supra—as that enactment appeared in both of the above citations—was *not* the law of this state when the State Committee's orders of November 2, 1973, and August 8, 1974, and the court's order of December 9, 1974, confirming these two orders were entered of record.[7]

When these orders of the State Committee and the court were entered in 1974, the following was the extant provision which—when amended in 1975—became § 21.1–134, W.S.1957, 1975 Cum.Supp., and then § 21–5–130, W.S.1977, namely:

"Section 134. *When all of the territory of the state* is included in unified school districts, the boards of trustees of the unified districts in each county shall constitute a committee with the powers and duties of the former county commit-

tees. Such committee may submit to the State Committee plans proposing organization of school districts which conform to the criteria and procedures set forth in this chapter, provided that the time limits provided by this chapter shall not apply to any such proposed further organization." [Emphasis supplied] S.L.1969, ch. 111, § 134.

The section, *after 1975,* reads as follows:

"When a plan of organization for a county has been approved by the state committee and the new trustees have taken office the boards of trustees of the unified districts in that county shall constitute a committee with the powers and duties of the former county committee. The committee may submit to the state committee plans proposing organization of school districts which conform to the criteria and procedures set forth in this chapter, but the time limits provided by this chapter shall not apply to any proposed further organization."

We take judicial notice of the fact that *"all of the territory of the state"* had not been included in unified school districts by the end of 1974. *Geraud v. Schrader,* Wyo., 531 P.2d 872, cert. den., 423 U.S. 904, 96 S.Ct. 205, 46 L.Ed.2d 134 (1974). We said in *Lund v. Schrader,* Wyo., 492 P.2d 202, 208 (1971), a Johnson County case:

". . . As we read § 21.1–134, it cannot be effective until all territory in the state is included in unified school districts, and this means the Johnson County unification will first have to be perfected."

Under the appellee's own theory (which, according to the brief, is that the County Committee was simply carrying out provisions of an ongoing State plan), the Big

---

6. Section 21–5–130, W.S.1977, provides:

"When a plan of organization for a county has been approved by the state committee and the new trustees have taken office the boards of trustees of the unified districts in that county shall constitute a committee with the powers and duties of the former county committee. The committee may submit to the state committee *plans proposing organi-*

*zation of school districts which conform to the criteria and procedures set forth in this chapter,* but the time limits provided by this chapter shall not apply to any proposed further organization." [Emphasis supplied]

7. We are concerned here with orders of 1973 and 1974. Therefore the amendments of 1975 (Ch. 33, § 1) and 1977 (Ch. 181, § 2), reflected in § 21–5–109, W.S.1977, are not applicable.

Horn County plan was not perfected (any more than was the Johnson County plan in *Lund v. Schrader,* supra), and, therefore, under *Lund,* § 21–5–130, supra, was not available to the parties in this case.

But, there are other reasons why the appellee cannot rely upon this section. The aforementioned conclusion of law says that "the Big Horn County Planning Committee is authorized to submit a plan proposing further school district organization . . . pursuant to . . . W.S. 21.1–134 and . . . the State Committee is authorized to approve said plan pursuant to W.S. 21.1–112(a)."

Let's look at the first part of the conclusion of law. Can the Big Horn County Committee submit a plan "proposing further . . organization" under § 21.1–134 (now § 21–5–130)—given the facts of this case?

That statute says:

". . . The committee (county) may submit to the state committee plans proposing *organization of school districts which conform to the criteria and procedures set forth in this chapter, . . ."* [Parenthetical matter and emphasis supplied]

The equalization plan submitted to the State Committee under the County Committee's resolution of May 17, 1977, was not such an "organization of school districts" plan as is contemplated by the section in question. This is so because this very term —"organization of school districts"—is defined in the definitions section, § 21–5–103, W.S.1977 [formerly § 21.1–107, W.S. 1957, 1975 Cum.Supp.]:

"(i) *'Organization of school districts'* or, 'organization of unified school districts' *means the formation of new unified school districts,* through alteration of the boundaries of established school districts, and dissolution and abandonment of established school districts by:

"(A) The combining of two (2) or more districts;

"(B) The subdivision of one (1) or more districts; and

"(C) The combination of either of the methods mentioned herein;" [Emphasis supplied]

The plan in question here did not conceive of "the formation of new unified school districts" and was, therefore, *not* such a plan as the County Committee was empowered to submit to the State Committee under § 21–5–130, supra. If that is so, the question which becomes relevant is— where did the power come from which enabled these committees to act as they did? We can find no statutory authority which gives the County Committee—acting after the State Committee has reorganized the school districts of a county, or at any other time after unification—the power to equalize the school districts by changing boundaries without going through a full-blown reorganization submission to the State Committee by authority of § 21–5–130. Furthermore, there is no authority in the statutes which would permit the State Committee to receive anything but an *organization* plan from the County Committee whose county school districts had previously been organized by the state or have otherwise become unified.

The conclusion of law, supra, recites that the State Committee is authorized to approve "the plan" (i. e., the equalization boundary-line-changing plan with which we are here concerned) under and by authority of § 21–5–108(a)(i), supra. But we can find no such authority in this section. If it were to be assumed, arguendo, that ¶ 46 of the State Committee's order of August 8, 1974, was a *"recommendation"* under § 21–5–108(a)(vi), W.S.1977 [formerly § 21.1–112(f), W.S.1957, 1975 Cum.Supp.] [8] instead of an

---

8. The subsection referred to provides, as one of the powers of the state committee, the authority

"(vi) [t]o *recommend* to any county committee such modifications of the plan for or-

ganization of the unified school districts of such county *as may appear to the state committee more feasible to effectuate the purpose of this chapter;"* [Emphasis supplied]

*order,* which it clearly seems to be, the County Committee, nevertheless, could not have implemented it since § 21–5–130 only gave the County Committee the power to submit to the State Committee plans "proposing organization of school districts"; and under the definitions section, § 21–5–103(a)(i)(A), (B) and (C), supra, the equalization scheme was not such a plan.

This brings us to the contention of the appellant having to do with whether the County Committee has the power to alter and change boundaries in these circumstances. We agree that there is no such authority contained in the statutes of this state.

Once the State Committee has reorganized the schools of the county into unified districts as it did here under § 21–5–109, supra, then the County Committee becomes possessed of the powers of the former County Committee. (See § 21–5–110, W.S. 1977, for membership on county planning committees.) Those powers permit submission of plans organizing school districts (§ 21–5–130, supra), and this procedure conceives of boundary-changing powers under the definitions section of the act—namely, § 21–5–103, supra. But there is no authority in the act for either a county committee to change boundaries or a state committee to direct, or even suggest, the changing of boundaries, *except where reorganization is taking place.* The legislature has specifically taken care of those situations where boundaries need altering, but reorganization is not contemplated. See, §§ 21–6–101 through 21–6–115, supra.

We, therefore, agree with counsel when he speaks to this issue in appellant's brief:

"The statutes of the state provide a method for boundary changes between school districts through action of a district boundary board, which consists of the County Assessor, Board of County Commissioners and County Treasurer. W.S. 21–6–101 through 21–6–115.

"W.S. 21–6–105 specifically provides that the district boundary board may sub-mit in writing to the state committee a proposal which would '(a)(i) Alter and change the boundaries of any school district of any kind; or'.

"While the statutory authority of the boundary board specifically provides for alteration and changes of boundaries of a school district, there is no such authority given to the boards of trustees of the school districts of a county while acting as a county reorganization committee, except as part of a complete 'plans proposing organization'. Nor is there any authority for the state committee to alter the boundaries of reorganized school districts, except upon recommendation of the boundary board or as a part of a complete reorganization plan."

## RATIONALE OF THIS DECISION

We reverse the judgment of the district court here because we find that the acts of the State and County Committees were not only not authorized by law, but they were, in fact, *specifically precluded by law.* See, § 21–5–130, supra; § 21–5–103(a)(i)(A), (B) and (C), supra; and § 21–6–105, supra.

Even though the schools of this state were to be—and largely have been—reorganized and the districts unified with the power of the state as the dominant force, it is, nevertheless, clear that the legislature intended, when reorganization and unification were completed, that the authority to run the schools would revert to the local trustee districts and the county committees.

When reorganization or just boundary-line changing was to be undertaken, the legislature contemplated that a broad spectrum of educational criteria was to be adhered to. Money is not the only consideration. The educational welfare of the children has to do with things besides just money. Under the statutes of this state, all of the statutory criteria pertaining to school district organization and boundary-line

changes must be complied with. See, § 21–5–105, supra, and § 21–6–105, supra.[9]

A scheme such as is in evidence here, whereby the State undertakes, without authority, to direct a county committee, that has no authority, to change and adjust boundary lines every year from now on based upon the equalization factor only, while ignoring other equally important statutory educational criteria, cannot be approved by this court. The statutes must be complied with.

We reverse the district court's judgment, affirming the State Committee's May 27, 1977, Order, and remand the case to the district court with directions to vacate the State Committee's Order and to order that the Big Horn County Committee, *if it so elects,* either submit a full reorganization plan to the State Committee in accordance with the school district organization statutes, or pursue a boundary-line change under the district-boundary-board statutes. In this regard, ¶ 46 of the State Committee's August 8, 1974, Decision and Order, or any similar communication from the State Committee to the County Committee, may be viewed, at most, as a recommendation under § 21–5–108(a)(vi), supra, to the County Committee, to be accepted or rejected according to the County Committee's good judgment and, if accepted, to be implemented by authority of the reorganization or boundary-board statutes.

Reversed and remanded.

MAIER, D. J., filed a dissenting opinion, with whom RAPER, C. J., joined.

RAPER, C. J., filed a dissenting opinion, with whom MAIER, D. J., joined.

MAIER, District Judge, dissenting, with whom RAPER, C. J., joins.

The majority opinion has fairly stated the facts, and further reference will be made to the factual background in this case only for the purpose of adding emphasis to those points deemed relevant.

My disagreement with the position of the majority opinion becomes most apparent in a consideration of the last sentence of the majority opinion which states:

"In this regard, ¶ 46 of the State Committee's August 8, *1974,* Decision and Order, or any similar communication from the State Committee to the County Committee, may be viewed, at most, as a recom-

9. Section 21–5–105, W.S.1977 [§ 21.1–109, W.S.1957, 1975 Cum.Supp.], provides:

"(a) *All districts organized after the effective date of this act* [§§ 21–5–101 to 21–14–106] *shall conform to the following criteria:*

"(i) Unified school districts shall be organized as efficient administrative units considering primarily the education, convenience, and welfare of the children;

"(ii) The entire state shall be divided into unified school districts. Any county which has been delayed by previous statutory exceptions may have until April 15, 1977, to complete its organization;

"(iii) All territory of each unified school district shall be contiguous;

"(iv) All territory within a unified school district shall be divided into trustee residence areas. Each trustee residence area shall be contiguous. In establishing trustee residence areas, consideration shall be given to school population, general population, and ecology;

"(v) *In developing plans of organization, the county committees shall consider a ratio of average daily membership to assessed valuation as nearly equalized as practicable among the unified districts in the various counties;*

"(vi) Each plan of organization shall include provisions for educational opportunity and services as nearly equal as possible in all areas of each unified district." [Emphasis supplied]

Section 21–6–105, W.S.1977 [§ 21.1–140, W.S.1957, 1975 Cum.Supp.], provides:

"(a) Any district boundary board or any two (2) or more district boundary boards acting jointly may, when in the judgment of such board or boards it would be for the benefit of the educational needs of the pupils, and where high school districts are involved only when the board or boards of such high school districts consent, submit in writing to the state committee a proposal which would:

"(i) Alter and change the boundaries of any school district of any kind; or

"(ii) Reorganize any such district or portions of districts; or

"(iii) Combine any school district or portion thereof having less than eight (8) pupils with any adjoining school district or districts; provided, that no existing district shall be divided in any manner which will leave the total assessed valuation of its property less in proportion to the number of children shown in its census than the average ratio for all school districts in the county unless the trustees for such districts agree thereto."

mendation under § 21–5–108(a)(vi), supra, to the County Committee, to be accepted or rejected according to the County Committee's good judgment and, if accepted, to be implemented by authority of the reorganization or boundary-board statutes." [Emphasis supplied]

By the last-quoted portion of the majority opinion, the majority have resolved issue No. I set out in the majority opinion, which issue is stated to be:

"Did the State Committee act in conformity with law when it directed the County Committee to equalize the school districts under the State Committee's ¶ 46 of the State Committee's Order of August 8, 1974 . . . ?"

If that in fact be the issue before this court, and it be so determined, then I cannot arrive at any other conclusion except that this court is permitting an appeal in 1979 of a December 9, 1974 District Court Order which approved and confirmed the school organization plan for Big Horn County as provided for in the State Committee's Decisions and Orders of November 2, 1973 and August 8, 1974. The District Court's Order in 1974 dismissed with prejudice the two pending Petitions for Review of the August 8, 1974 Decision and Order of the State Committee, upon stipulation of the parties to those pending civil actions, of all issues involved. It was this August, 1974 Decision and Order of the State Committee, in ¶ 46 thereof, which directed and ordered the County Committee to meet on an annual basis in order to equalize the assessed valuation per pupil ADM.

Subparagraph (g) of § 112 of Chapter 111, Session Laws of Wyoming, 1969, which was in force in 1973 and 1974, and still remains in force in the same words, provided:

". . . The order providing for establishment of the unified district shall become effective and binding ten (10) days after it is so filed."

When the County Committee has subsequently carried out the mandate of the August 1974 Decision and Order, in its 1977 action of equalizing the assessed valuation per pupil ADM, and this is now attacked, I cannot escape the conclusion that this court is permitting an appeal from a 1974 Decision and Order which became final at least four years ago or more, both by statute as quoted above and by the rules of timely appeal to this court.

I will only say in conclusion that it is my feeling that the reorganization process was completed by the August 1974 Decision and Order of the State Committee. This Order became final and binding after two Petitions for Review were filed in the Big Horn County District Court and then later *dismissed with prejudice,* based on stipulation of the parties of all issues involved. Even if that Judgment of the District Court entered in 1974 was erroneous, how can we permit it to be collaterally attacked, or in effect permit an appeal to be taken from it approximately four years later, and then construe it and hold that a provision of that Order was not in fact a direction but only a recommendation which is simply judicial construction of an order not now before us?

RAPER, Chief Justice, dissenting, with whom MAIER, D. J., joins.

While I agree with the concept of the integrity of court judgments expressed by Judge Maier in his dissent and have accordingly joined with him, I am convinced there are further grounds to affirm the district court, so therefore file this separate dissent.

There is sound reason as well as statutory authority for the county committee to operate in a continuing role from year to year, to equalize the assessed valuation per pupil ADM. When the district court in 1974 approved the plan on the reorganization of school districts in Big Horn County, it approved a plan which was ongoing, lending it a flexibility that appears most desireable. Districts within a county because of population shifts and fluctuating land valuations, cannot nor should they become rigidly fixed entities. It was a wise provision of the plan that the boundaries be adjusted from time to time to meet changing needs and allow perfection of the basic reorganization, as required. I consider that to be "further organization" within the scope of § 21–5–130, W.S.1977. The most compelling theme

in school district organization mandated by the legislature is equalization of assessed valuation which is synonymous with "equalized educational opportunity". §§ 21–5–102 and 21–5–105, W.S.1977. Only money makes the latter possible.

It is impractical to remand the matter to the county committee to undertake a complete reorganization, when there has been no showing made that the criteria prescribed by § 21–5–105, supra, is in any respect lacking, after the 1977 equalization undertaken by the county committee. It was decided in 1974 that the other criteria had in fact been met and that part of the reorganization is still intact and settled.

While the majority offers the alternative of complete reorganization procedures by the county committee or action by the district boundary board it appears to me that the county committee must cling to its function. The county committee was legislatively designed to deal with matters of education as it relates to school district organization. It is noticed that there is not a single member from the field of education on the district boundary board, § 21–6–101, W.S.1977, now that the office of county superintendent of schools has been abolished by §§ 21–8–101–102. An anomaly is created by the majority decision in that even if the matter of boundary changes for purposes of equalization is submitted to the district boundary board, any proposal it may have must be submitted for approval to the same state committee that has already approved the plan now before the court and which it, through the Attorney General, is struggling to have sustained! §§ 21–6–105 and 21–6–107, W.S.1977. If the boundary board would have no proposal for change, then it is back with the county committee to go through the rigamarole of full blown reorganization procedures, even though not necessary. Statutes ought be construed in a reasonable manner. *In re Romer*, Wyo.1968, 436 P.2d 956.

It is my conclusion that the legislature intended to and has placed in the hands of the county committee the responsibility for school district organization. The county committee has here assumed that obligation with the approval of the state committee. Continuing update has been provided as part of the plan, a concept I see nowhere prohibited. It is fundamental that statutes be construed in the light of the objects and purposes to be accomplished. *Wyoming State Treasurer v. City of Casper*, Wyo. 1976, 551 P.2d 687. This Court in *Board of Trustees of School District No. 3, In County of Natrona v. District Boundary Board of Natrona County*, Wyo.1971, 489 P.2d 413, 415, has said that § 21–6–107, supra, means that efforts of the county committee for the organization of school districts must have precedence over proposals of the district boundary board on matters of school district organization.

It would appear that the majority view means that legislature ought to better define the functions of the county committee and the district boundary board, if the latter has any usefulness or is only vestigial, on the matter of continuing organization, unless it, too, is satisfied with a splintering of accountability in school district organization matters.

I would have affirmed the district court.