TOWN OF TORRINGTON, Wyoming, a Municipal Corporation, Appellant (Petitioner below),

v.

The ENVIRONMENTAL QUALITY COUNCIL of the State of Wyoming, Appellee (Respondent below).

No. 4563.

Supreme Court of Wyoming.

Dec. 28, 1976.

Larry V. Rogers, Jones & Rogers, Torrington, signed the brief and Donald E. Jones and Larry V. Rogers, Torrington, appeared in oral argument for appellant.

V. Frank Mendicino, Atty. Gen., and Marilyn S. Kite, Spec. Asst. Atty. Gen., Cheyenne, signed the brief and Marilyn S. Kite appeared in oral argument on behalf of the appellee.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

RAPER, Justice.

Appellant Town of Torrington appeals a judgment of the district court in and for Goshen County affirming the finalization of a cease and desist order entered by the appellee Environmental Quality Council of Wyoming against Torrington in connection with its use of a solid waste disposal site. The Town of Torrington had begun use of a piece of land for a municipal waste disposal site, it being part of a larger parcel of land owned by the Town, bordering the North Platte River, another portion of which had previously been used as a Town waste disposal facility. In response to citizen complaints of blowing paper and other offensive aspects of the changed landfill operation on Town land, the Department of Environmental Quality made an on-the-spot inspection. As a result of the survey, because of a disclosed danger of polluting State waters, a notice was sent to the Mayor of Torrington specifying statutes being violated, §§ 35–502.43 and 35–502.18(a)(i),[1] and advising him of the requirement that plans for the disposal site must be submitted to the director of the Department for approval. No response was forthcoming so on August 19, 1974, a cease and desist order was issued by the Department. At Torrington's request, a hearing was held in September, 1974, and the Environmental Quality Council affirmed the Department's order. On appeal to the District Court, the Council's decision was approved. Enforcement has been stayed pending the outcome of this appeal.

The questions presented by the Town for consideration of this Court are as follows:

1. Whether the Environmental Quality Council is required to promulgate by rule or regulation a definition of a "new solid waste disposal site" as used in § 35–502.43?

2. Does the change of a pit location for solid waste disposal within an area designated by a municipality for disposal of solid waste constitute a "new site" within the meaning of § 35–502.43?

3. Whether the Town of Torrington is exempt from the actions of the Depart-

1. (We will in the opinion cite only the section numbers of Wyoming Statutes, 1957, as amended, and in effect and applicable to this case unless otherwise noted.)

Section 35–502.43 provides:

"(a) Every person or municipality that proposes to establish a new solid waste disposal site shall submit to the director its proposed plans. The plans shall include drawings, specifications and descriptive information in sufficient detail to describe the location, local ground surface, groundwater conditions, distance to roads and all-weather accesses, distances to dwellings and other such technical data sufficient for the director to analyze the conditions relevant to the disposal site. The director shall consult, advise and approve the site prior to its use.

"(b) The director may request and obtain similar information regarding present sites, for the purpose of determining the adequacy and approvability of existing solid waste disposal sites. The municipality having jurisdiction shall consult with and submit information to the director for initial review of the site with respect to its adequacy, absence of water or air quality effect, and overall utility as a disposal site. Any water quality or air quality violation at such existing sites will be cause to require abatement and relocation. Aspects of undesirable, although nonviolating character, such as poor access, aesthetic site management or other such aspects or undesirability shall be cause for the director to study the site for the purpose of recommending improvements."

Section 35–502.18(a)(i) provides:

"No person, except when authorized by a permit issued pursuant to the provisions of this act [§§ 35–502.1 to 35–502.56], shall:

"(i) Cause, threaten or allow the discharge of any pollution or wastes into the waters of the state;"

ment of Environmental Quality under the provisions of § 35–502.56?

4. Whether the Environmental Quality Council is required to promulgate rules and regulations under §§ 35–502.12 and 35–502.19 before making findings of pollution of waters under § 35–502.19(i) and issuance of order to cease and desist under § 35–502.46(b).

5. Whether the findings of fact made by the Environmental Quality Council are supported by substantial evidence?

In 1940, the Town of Torrington acquired a piece of land as a Town dump. The North Platte River meanders along its southeast edge. What is known as "Pit Site A" was established on the land and for many years was used for solid waste disposal, originally by burning and eventually by landfill methods. That particular area was used to the limit of space available. The Town moved east to the opposite side of the tract, dug a landfill disposal trench and started burial of solid waste in the new location, designated "Pit Site B." It is near a highway, some residences and farming land. The Wyoming Department of Environmental Quality received complaints, mostly of blowing paper, but also the odor, flies, rats, polluting the river and its unsatisfactory aesthetics, in general. The Town's acreage was also the location of an animal rendering plant, the dog pound and Torrington's sewer lagoons.

An engineer of the Wyoming Department of Environmental Quality was dispatched to investigate. He examined the site and discovered an apparent danger of polluting underground waters and the river by the landfill on Site B. He conferred with Town officials, advising that the new site should never have been used, had been established without department approval and that action would have to be taken with regard to the use of the site.

The Mayor of Torrington was formally advised that the site could not be approved and plans were requested for a site which could be favorably considered. The Town

was warned that if not received within 10 days, a cease and desist order would be issued. This was not hasty, arbitrary, abrupt action! Two years previously, an engineer of the department had recognized the dangers and the department offered assistance in relocation of the dump. The Town tried to obtain federal land through the Bureau of Land Management, Department of the Interior, United States of America. Representatives of the State Health Department assisted. At the time of hearing before the Environmental Quality Council, the Town had met with little success because of federal requirements. At oral argument, this court was informed that the Town was in the process of relocating its solid waste disposal to federal land finally made available to the Town. Both sides, however, urged that the questions are not moot. The Town still owns the land upon which the offending operation is located, a risk of further use exists and some of the questions here involved may evade review, if not now considered. This case is one of the first to be presented to this Court in the arena of environmental control. Further facts will be developed as they relate to each of the issues presented.

■ There is no requirement that with respect to solid waste sites there must be rules and regulations for their establishment. Section 35–502.44, cited by the Town, provides only for rules pertaining to operation, not establishment of solid waste sites, with which we are concerned. Sections 35–502.9 and 35–502.12, cited by the Town, discuss the general powers and responsibilities of the director and Council respectively, and are general provisions which provide authority for the promulgation of regulations and standards "necessary," and not on an assembly line basis which would cause an undesirable inflexibility in the agency's functioning, and impair its ability to deal with specialized problems. *Securities and Exchange Commission v. Chenery Corporation*, 1947, 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed.

1995, 2002, reh. den. 332 U.S 783, 68 S.Ct. 26, 92 L.Ed. 367. The administrative process could be stultified if a rule was required for every conceivable set of circumstances. We are careful to note at this point that there may be situations in which rules and regulations are "necessary" in connection with establishment of a new site but we must confine ourselves to the case at hand.

Under the circumstances of this case, there is no necessity for a rule defining a new site because § 35–502.43 provides as follows:

"(a) Every person or municipality that proposes to establish a new solid waste disposal site shall submit to the director its proposed plans. The plans shall include drawings, specifications and descriptive information in sufficient detail to describe the location, local ground surface, groundwater conditions, distance to roads and all-weather accesses, distances to dwellings and other such technical data sufficient for the director to analyze the conditions relevant to the disposal site. The director shall consult, advise and approve the site prior to its use."

That means and anticipates that each site must be treated upon an individual basis and the use of rules and regulations are of no value at least under the elements of this action. A municipality has this statutory notice that it cannot establish a new solid waste disposal without prior approval and before establishment must be analyzed for adequacy. That thus avoids establishment and argument about sufficiency later, as resulted in this dispute. If there were no approval required by statute before establishment, then we would perhaps look more seriously at the need for rules, regulations and published standards. Here, again, we must be cautious to note that there may be situations where some rules should be promulgated to guide a town in the establishment of solid waste sites and we are hesitant to suggest that under some circumstances other than those before us rules are not necessary. We prefer to leave that to the technical expertise and discretion of the agency.

Even further than that, the Town has been aware ever since March 16, 1972, of the availability of advice and consultation with the agency when the inadequacy of its solid waste facilities was first noticed. At that time a survey was made, the Town Council was notified and the matter discussed with the Council. The Town was even in that year looking for a new site. In the report made to the Town, by what was then called Sanitary Engineering Services, Division of Health and Medical Services, Wyoming Department of Health and Social Services, the following was said:

"The Community is commended for obvious effort in planning a solution for a public works problem of no small dimension. If as plans proceed, and should additional assistance be required, please do not hesitate to request assistance."

The community thus had available every technical assistance in the selection of a new site and the Town would know the agency criteria. The Legislature since that time has made the same advice available. Section 35–502.42 provides:

"In addition to the other powers and duties enumerated in this act [§§ 35–502.1 to 35–502.56], the director of the department shall coordinate the activities of all state agencies concerned with solid waste management and disposal. In this capacity the director shall advise and consult with any person or municipality with respect to provisions of technical assistance in solid waste management technology, including collection, storage and disposal."

The Town is in no position to complain that it could not know the requirements of

the agency.[2] The agency did not act arbitrarily.

■ The Town further asserts that it was not within the language of § 35–502.43 requiring submission of proposed plans before establishing a "new solid waste disposal site," because it was actually within the same tract of land as the "Pit A" it had abandoned, since it ran out of space in "Pit Area A" and therefore no new site was actually established.

Webster's Third New International Dictionary, Unabridged, defines "new" as "having existed or having been made but a short time : having originated or occurred lately : not early or long in being * * * being other than the former or old : having freshly come into relation (as use, connection or function) * * * of land : undergoing or about to undergo cultivation for the first time (broke 10 acres of new ground that winter) : different or distinguished from a person, place or thing, or thing of the same kind or name that has longer previously existed (the new reservoir) * * *."

Webster defines "site" as "the local position of building, town, monument, or similar work to be constructed or to be constructed esp. in connection with its surroundings * * * the scene of an action * * * or specified activity * * *."

Since the term "new site" is relative, we must construe it in the light of facts with which we are here confronted. The only common denominators are that it is within a single tract of land owned by the Town and the use is the same. There is a distinct physical separation of Pit A and Pit B. Pit A (old) is located in the NE ¼ SE ¼, Section 15, Township 24 North, Range 61 West, while Pit B (new) is in the NE ¼ SW ¼, Section 14, Township 24 North, Range 61 West. The distance between pits (1,400 feet) is more than a quarter of a mile. Access to each pit is by a different highway: Pit A by U. S. Highway 85, south of the Town, and Pit B by State Highway 26, east of the Town. Within the tract at or near its center and between the two pits is a block of privately-owned land upon which is operated a private enterprise known as Scotty's By-Products, the animal rendering plant previously mentioned. The two pits are not used in conjunction with each other.

We hold that under the facts and circumstances of this case, and giving the words their ordinary meaning, a "new solid waste disposal site" was established without authority. It had the capability of a separate and new existence. It depends not upon ownership of the land upon which it rests. It was a facility not previously existing on the particular area of

2. We notice further that by the 1972 communication referred to, the Town was furnished a copy of Sanitary Landfill Facts published by the U. S. Department of Health, Education, and Welfare, Public Health Service, Environmental Health Service, Bureau of Solid Waste Management, 1970, warning of placing a landfill in contact with groundwater. It was introduced into evidence by the Town at the administrative hearing. At page 15, it is there said:

> "*Water Pollution.* Under certain geological conditions, the burial of solid wastes is a real potential for chemical and bacteriological pollution of ground and surface waters. Several investigations of the pollution of groundwater from landfills have indicated that if a landfill is intermittently or continuously in contact with groundwater, it can become grossly polluted and unfit for domestic or irrigational use.

> "Proper planning and site selection, combined with good engineering design and operation of the sanitary landfill, can normally eliminate the possibility of either surface or groundwater pollution. Some common preventive measures are:
> (1) locating the site at a safe distance from streams, lakes, wells, and other water sources; (2) avoiding site location above the kind of subsurface stratification that will lead the leachate from the landfill to water sources, i. e., fractured limestone; (3) using an earth cover that is nearly impervious; (4) providing suitable drainage trenches to carry the surface water away from the site."

The bottom of the new landfill at Site B was in direct contact with groundwater.

ground upon and in which it lies. No regulation or rule defining "new * * * site" is required, the statutory language being sufficient.

■ The Town also contends that the department and Council are without authority to act in this matter because of a now-deleted provision in § 35–502.56, which provided:

"Nothing in this act [§§ 35–502.1 to 35–502.56]:

> * * * * * *
>
> "(c) Supersedes or limits the applicability of any law or ordinance relating to sanitation, industrial health or safety."

That provision was in effect at the time the cease and desist order was initially entered in August, 1974, but has since been repealed, § 3, Chapter 198, S.L. Wyoming, 1975. Torrington maintains that its ordinance, No. 527, passed September 3, 1974, falls within this provision. The ordinance purported to ordain that the ground upon which the questioned landfill operation was underway "was under the sole control of the Town" and was "the best available location for disposal of solid wastes and refuse * * * to assure a solid waste disposal site." The ordinance in question was passed by Torrington after the cease and desist order had been entered on August 19, 1974.

Thus, when the initial action was taken by the department, there was no city ordinance in effect to limit its authority as may have been the situation contemplated by § 35–502.56(c). Acceptance of the Town's contention would have permitted Torrington or any other municipality to exempt itself from and evade the provisions of the Environmental Quality Act. Such exclusion of a municipality from the effect of the Environmental Quality Act was clearly not the intent of the legislature as indicated by the fact that municipalities are included in the definition of "person" under the Act, § 35–502.3(a)(v) and are specifically made subject to the provisions of the waste management article, § 35–502.42, et seq. It is fundamental that a statute must be viewed in the light of the objects and purposes to be accomplished. *Wyoming State Treasurer v. City of Casper*, Wyo.1976, 551 P.2d 687, 697. Such an interpretation as that urged by the Town would be permitting the tail to wag the dog. Municipalities are creatures of the Legislature, and only have such powers as have been granted by the State. *City of Buffalo v. Joslyn*, Wyo.1974, 527 P.2d 1106. Section 35–502.2, in outlining the policy and purpose of the Environmental Quality Act expressly declared a purpose "to retain for the state the control over its air, land and water." The position of the Town would be inconsistent with that clear provision.

■ ■ The Town further insists that before the Council can make findings regarding water pollution and issue an order pursuant to § 35–502.46(b) [3] it must make regulations under §§ 35–502.12 [4] and 35–

---

3. Section 35–502.46, in pertinent part, provides:
   " * * * (b) In case of failure to correct or remedy an alleged violation, the director shall cause to be issued and served upon the person alleged to be responsible for any such violation a written notice which shall specify the provision of this act [§§ 35–502.1 to 35–502.56], rule, regulation, standard, permit, license, or variance alleged to be violated and the facts alleged to constitute a violation thereof, and may require the person so complained against to cease and desist from the violation within the time the director may determine."

4. Section 35–502.12, in pertinent part, provides:

"(a) The council shall act as the hearing examiner for the department and shall hear and determine all cases or issues arising under the laws, rules, regulations, standards or orders issued or administered by the department or any division thereof. The council shall:
"(i) Promulgate rules and regulations necessary for the administration of this act [§§ 35–502.1 to 35–502.56], after recommendation from the director of the department, the administrators of the various divisions and their respective advisory boards;
"(ii) Conduct hearings as provided by the Wyoming Administrative Procedure Act for the adoption, amendment or repeal of rules,

502.19,[5] relating to maximum short-term and long-term pollution concentrations. We need not reach this question because the failure of the Town to obtain prior approval from the director is a violation of the Act and, under such circumstances, an order to cease and desist on that ground alone is sufficient. We do suggest, however, that the Council must give consideration to the promulgation of standards and regulations mandated by the Legislature.

■ During the course of discussion of the other issues made, we have purposely intermingled detailed facts preparatory to disposition of the Town's point that the findings of fact made by the Environmental Quality Council are not supported by substantial evidence. The term "substantial evidence," while, "it is more than a mere scintilla * * * means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Howard v. Lindmier*, 1950, 67 Wyo. 78, 214 P.2d 737. We concur in and agree with the Environmental Quality Council in its reasoned conclusion that "Under the applicable statute prior approval of the Department of Environmental Quality is required for establishment of a new site and such

approval was not obtained. This omission constitutes a violation of Section 35–502.-43(a), W.S.1957 (Cum.Sup.1973)."

It is added in passing that we detect that there was expertise in the membership of the Council. Courts must respect the judgment of agencies and we will not substitute our judgment for theirs. *Shenefield v. Sheridan County School District No. 1*, Wyo.1976, 544 P.2d 870, 874. We must limit our review to the authority granted by § 9–276.32(c), in effect since 1965, and confine ourselves to a determination whether:

"(i) The agency acted without or in excess of its powers;

"(ii) The decision or other agency action was procured by fraud;

"(iii) The decision or other agency action is in conformity with law;

"(iv) The fndings of fact in issue in a contested case are supported by substantial evidence; and

"(v) The decision or other agency action is arbitrary, capricious or characterized by abuse of discretion."

We hold favorably for and affirm the District Court and the Council.

regulations, standards or orders recommended by the advisory boards through the administrators and the director. The council shall approve all rules, regulations, standards or orders of the department before they become final;
"(iii) Conduct hearings in any case contesting the administration or enforcement of any law, rule, regulation, standard or order issued or administered by the department or any division thereof;
* * * * *
"(c) Subject to any applicable state or federal law, and subject to the right to appeal, the council may:
"(i) Approve, disapprove, repeal, modify or suspend any rule, regulation, standard or order of the director or any division administrator;
"(ii) Order that any permit, license, certification or variance be granted, denied, suspended, revoked or modified;
"(iii) Affirm, modify or deny the issuance of orders to cease and desist any act or practice in violation of the laws, rules,

regulations, standards or orders issued or administered by the department or any division thereof. Upon application by the council, the district court of the county in which the act or practice is taking place shall issue its order to comply with the cease and desist order, and violation of the court order may be punished as a contempt."

5. Section 35–502.19, in pertinent part, provides:
"(a) The administrator, after consultation with the advisory board, shall recommend to the director rules, regulations, standards and permit systems to promote the purposes of this act [§§ 35–502.1 to 35–502.56]. Such rules, regulations, standards and permit systems shall prescribe:
"(i) Water quality standards specifying the maximum short-term and long-term concentrations of pollution, the minimum permissible concentrations of dissolved oxygen and other matter, and the permissible temperatures of the waters of the state;
* * * * * "