The PEOPLE of the State of Wyoming, Appellants (Plaintiffs),

v.

PLATTE PIPE LINE COMPANY, a Delaware corporation, Appellee (Defendant).

No. 5666.

Supreme Court of Wyoming.

Aug. 5, 1982.

Steven F. Freudenthal, Atty. Gen., Walter Perry, III, Sr. Asst. Atty. Gen., and Marion Yoder, Asst. Atty. Gen. (argued), for appellants.

Morris G. Gray, Patrick G. Pitet (argued), and R. Patrick Dixon of Murane & Bostwick, Casper, for appellee.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

RAPER, Justice.

This appeal is taken from the dismissal of a complaint that sought to recover the damages suffered by the People of the State of Wyoming as a result of an oil spill into state waters. The basis for the dismissal was the failure to state a claim for which relief could be granted. The question for us to decide is whether the Wyoming Environmental Quality Act § 35–11–101, et seq., W.S.1977, imposes strict liability for civil penalties upon the operator of a crude oil pipeline which discharges oil into state waters.

We will reverse and remand for further proceedings.

When a court is called upon to decide whether a claim has been stated, it must accept the facts alleged in the complaint as true and view the entire matter in the light most favorable to the plaintiff. *Moxley v. Laramie Builders, Inc.*, Wyo., 600 P.2d 733 (1979). Since this appeal is from a dismissal for failure to state a claim, we will treat the facts stated in the complaint as proven and set them out accordingly.

On April 8, 1980, a high-pressure crude oil pipeline owned and operated by appellee in Converse County, Wyoming, ruptured. As a result, an estimated eight thousand, five hundred fifty-two barrels of crude oil were discharged into the North Platte River. The specific location of the oil spill was in the south-east one-quarter of the northwest one-quarter (SE¼ NW¼) of section thirty-three, township 34 north, range 75 west, in Converse County. The river itself was contaminated from the town of Glenrock to Glendo Reservoir, a distance of approximately sixty-eight miles.

Numerous federal, state, and county agencies responded to the crisis and worked to clean up the spill. By May 2, 1980, it was estimated that ninety-five percent of the oil that had spilled into the river had been recovered. Nevertheless, considerable harm had been done to the area's wildlife and ecosystem. The known and tangible casualties included: one thousand, seven hundred fifty-two muskrats, four beavers, a raccoon, nineteen geese, one hundred nine ducks, and one hundred eighty-three goose eggs. Further, the clean up effort had required the expenditure of substantial sums of money by the state. By March 25, 1981, the Wyoming Game and Fish Commission had expended forty-eight thousand, three hundred twenty-five dollars as a result of the spill, while the Wyoming Department of Environmental Quality had expended four thousand, two hundred ninety dollars.

On March 25, 1981, the Wyoming Attorney General, as the representative for the People of the State of Wyoming, initiated an action against appellee, as the owner and operator of the pipeline which discharged

the crude oil. The theory of the complaint was that, because oil had been discharged from appellee's pipeline into waters of the state, appellee had violated § 35–11–301(a)(i) and (ii), W.S.1977, and was thus liable for the civil penalties set out in § 35–11–901(a) and (b), W.S.1977. Section 35–11–301(a)(i) and (ii), supra, provides:

"(a) No person, except when authorized by a permit issued pursuant to the provisions of this act, shall:

"(i) Cause, threaten or allow the discharge of any pollution or wastes into the waters of the state;

"(ii) Alter the physical, chemical, radiological, biological or bacteriological properties of any waters of the state."

Section 35–11–901(a) and (b), supra, provides: [1]

"(a) Any person who violates any provision of this act, or any rule, regulation, standard or permit adopted hereunder or who violates any determination or order of the council pursuant to this act or any rule, regulation, standard, permit, license, or variance is liable to a penalty of not to exceed ten thousand dollars ($10,000.00) for each day during which violation continues, which may be recovered in a civil action, and such person may be enjoined from continuing the violation as hereinafter provided. Damages are to be assessed by the court.

"(b) Any person who violates this act, rule, regulation, and thereby causes the death of fish, aquatic life or game or bird life is, in addition to other penalties provided by this act, liable to pay to the state, an additional sum for the reasonable value of the fish, aquatic life, game or bird life destroyed. Any monies so recovered shall be placed in the general fund of Wyoming, state treasurer's office. All actions pursuant to this article [§§ 35–11–901, 35–11–902] shall be brought in the county in which the violation occurred or in Laramie county by the attorney general in the name of the people of Wyoming."

On April 16, 1981, appellee moved to have the complaint dismissed for failure to state a claim. On May 22, 1981, appellee filed its brief in support of its motion. The main thrust of its argument was that (1) § 35–11–301(a)(i) and (ii), supra, did not bar the discharge of oil into waters of the state, and (2) even if it did, the statute required a person charged with a violation to have been at fault in some manner, in permitting the discharge to occur. The Wyoming Attorney General responded that the discharge of oil into Wyoming waterways was prohibited, and that whoever allowed a discharge of oil was strictly liable, regardless of fault.

On February 18, 1982, the district court granted appellee's motion. In its opinion letter, it indicated that it did not believe that the legislature intended to "impose strict liability for an oil spill." We are now called upon to review the district court's interpretation of § 35–11–301(a)(i) and (ii), supra.

We first address the question as to whether § 35–11–301 is violated when oil is discharged into state waters. This court has observed frequently that where a statute is clear on its face, there is no need to resort to rules of statutory construction. *Board of County Commissioners of County of Campbell v. Ridenour*, Wyo., 623 P.2d 1174 (1981); *State v. Sinclair Pipeline Company*, Wyo., 605 P.2d 377 (1980); *Matter of North Laramie Land Company*, Wyo., 605 P.2d 367 (1980).

Here the statute in essence states that no person shall allow the discharge of any pollution into state waters, nor shall any person alter the physical, chemical, or biological properties of state waters. In § 35–11–103(c)(vii), W.S.1977, "discharge"

---

1. Section 35–11–901 was amended November 26, 1980, by ch. 64, § 2, Session Laws of Wyoming. The amendment did not substantially alter the quoted subsections (a) or (b), however (b) then appeared as subsection (h) in the amended statute. On July 1, 1982, part of subsection (h) was removed from that subsection and placed in subsection (q). Again, no substantial change resulted for our purposes in this case. To avoid confusion, in this opinion we will merely cite to § 35–11–901, supra, without reference to the specific subsections.

is defined for our purpose here to mean "any addition of any pollution or wastes to any waters of the state." In § 35–11–103(c)(i), W.S.1977, "pollution" in regard to water quality, is defined to mean:

" * * * [C]ontamination or other alteration of the physical, chemical or biological properties of any waters of the state, including change in temperature, taste, color, turbidity or odor of the waters or any discharge of any acid or toxic material, chemical or chemical compound, whether it be liquid, gaseous, solid, radioactive or other substance, including wastes, into any waters of the state which creates a nuisance or renders any waters harmful, detrimental or injurious to public health, safety or welfare, to domestic, commercial, industrial, agricultural, recreational or other legitimate beneficial uses, or to livestock, wildlife or aquatic life, or which degrades the water for its intended use, or adversely affects the environment. This term does not mean water, gas or other material which is injected into a well to facilitate production of oil, or gas or water, derived in association with oil or gas production and disposed of in a well, if the well used either to facilitate production or for disposal purposes is approved by authority of the state, and if the state determines ·that such injection or disposal well will not result in the degradation of ground or surface or water resources."

We must conclude that crude oil comes within the definition of pollution for water quality as set out in § 35–11–103(c)(i), supra. Further, since discharge is defined in § 35–11–103(c)(vii), supra, to mean any addition of pollution to state waters, when oil spills and mixes into a Wyoming river, pollution has been added to the water. Therefore, in terms of § 35–11–301(a)(i), a discharge of pollution has occurred.

■ Also, oil's addition to water will definitely alter the physical, chemical or biological properties of the water. This includes a change in taste, color, turbidity or odor of the water. Also the oil will render the water harmful to public health, livestock, wildlife, and aquatic life. Though none of these facts were alleged in the complaint, they are so well known that they come within the scope of matters a court should take judicial notice of when considering whether to dismiss a complaint for failure to state a claim for which relief may be granted. *Bon v. Lemp*, Wyo., 444 P.2d 333 (1968). We take judicial notice of the effect on water when crude oil is added to it. Clearly then oil spilling into a Wyoming river comes within the scope of § 35–11–301(a)(ii), supra, since it clearly alters the water's physical, chemical and biological properties.

■ Appellee tries to avoid the clear import of the statutory language by categorizing it as a permitting statute. Focusing upon the language in § 35–11–301, supra, which exempts from compliance with its terms activities for which a permit has been issued, appellee maintains that the statute only prohibits that activity for which a permit could have been obtained but was not. Since a permit could not have been issued to cover an accidental oil spill, appellee argues that it should not be read as barring such a spill. That approach is undiluted sophistry.

The problem with appellee's position is that it ignores the Environmental Quality Act's stated purpose. In § 35–11–102, W.S. 1977, the purpose and policy of the Act is spelled out:

"Whereas pollution of the air, water and land of this state will imperil public health and welfare, create public or private nuisances, be harmful to wildlife, fish and aquatic life, and impair domestic, agricultural, industrial, recreational and other beneficial uses; it is hereby declared to be the policy and purpose of this act to enable the state to prevent, reduce and eliminate pollution; to preserve, and enhance the air, water and reclaim the land of Wyoming; to plan the development, use, reclamation, preservation and enhancement of the air, land and water resources of the state; to preserve and exercise the primary responsibilities and rights of the state of Wyoming; to retain

for the state the control over its air, land and water and to secure cooperation between agencies of the state, agencies of other states, interstate agencies, and the federal government in carrying out these objectives."

■ The permitting system, included in the Act, was designed to provide the state with the flexibility necessary to deal with certain economic realities. The legislature knew that business and industry, essential to the state's economic health, had to be maintained. And though it is an unfortunate statement on our modern age, technology is currently such that pollution can and does result from some commerce. So the legislature adopted the permit scheme for businesses normally discharging wastes, under which the businesses would be authorized in advance to continue polluting the state's waters so long as the pollution remained within certain acceptable limits.

Clearly, however, there are some types of pollution which are unacceptable in any amount and thus under the Act it may be determined by the appropriate agencies that no permit would be made available. But, accepting appellee's argument, since no permit could be obtained for those, the most harmful and hazardous pollutants, their discharge into state waterways was not prohibited by the Act, and they may be dumped in any amount at will. Obviously such a reading of the statute would render it ineffectual in eliminating, reducing and preventing pollution, and thus defeat its stated purpose. It is unreal to believe that a permit to allow an unanticipated occurrence such as that here described would be granted even if applied for. Pipelines do not—at least at the point of rupture, as here—normally discharge wastes.

■ A basic tenet of our judicial system is that a statute must be read in light of its purpose. *Wyoming State Treasurer v. City of Casper*, Wyo., 551 P.2d 687 (1976). If a statute is clear on its face and the results produced by a literal reading help bring about the stated objective, we will not entertain strained constructions which impede the legislative policy. *Town of Torrington*

*v. Environmental Quality Council*, Wyo., 557 P.2d 1143 (1976). As was stated by the United States Supreme Court when it construed the Rivers and Harbors Act and decided that spilled oil was refuse under that statute:

"This case comes to us at a time in the Nation's history when there is greater concern than ever over pollution—one of the main threats to our free-flowing rivers and to our lakes as well. The crisis that we face in this respect would not, of course, warrant us in manufacturing offenses where Congress has not acted nor in stretching statutory language in a criminal field to meet strange conditions. But whatever may be said of the rule of strict construction, it cannot provide a substitute for common sense, precedent, and legislative history. * * * " *United States v. Standard Oil Co.*, 384 U.S. 224, 225, 86 S.Ct. 1427, 1428, 16 L.Ed.2d 492 (1966).

■ We would also note that, when the aim of a legislative enactment is the accomplishment of the public's protection, the legislation is entitled to a liberal construction. This is necessary in order to insure that the public is in fact protected from the menace that the legislature has seen fit to attack. *Woolley v. State Highway Commission*, Wyo., 387 P.2d 667 (1963). Environmental protection statutes have as their goal public protection; they are entitled to a liberal construction. When faced with claims under the Environmental Quality Act, courts of this state must "at all times be ready and willing to afford such remedies as are within the law." *Roberts Construction Company v. Vondriska*, Wyo., 547 P.2d 1171, 1182 (1976).

■ Clearly it is more consistent with the Act's stated purpose to bar the discharge of all pollution and exempt only those pollution sources for which a permit has been obtained in advance and upon a showing that the discharge would leave water quality within acceptable limits. Since that is what the statutory language taken literally says, and since such a reading would produce results harmonious with the Act's objective, we so read the Act.

Having concluded that the discharge of crude oil in state waters is within the scope of § 35–11–301(a)(i) and (ii), supra, we now consider whether civil liability attaches regardless of fault. Appellee pipeline company argues that the language used in § 35–11–301, supra, is only violated where an operator of a pipeline intentionally, recklessly, or negligently permits crude oil to enter a waterway. The Wyoming Attorney General argues that the question of the operator's fault is irrelevant. Since the statute contains no provision requiring negligence in permitting pollution before liability can attach, he contends that the operator of a pipeline is strictly liable in the event of an oil spill. The Attorney General acknowledges that no claim of negligence on the part of appellee was made in the complaint, but he argues that such an allegation was not needed to state a claim.

▪ The statutory language in question states "No person * * * *shall*: (i) Cause, threaten or allow the discharge of any pollution * * *; (ii) Alter the physical, chemical * * * or bacteriological properties of any waters of the state." The clear import of this language is that *if a person alters the waters' quality without a permit, he then has violated the statute, regardless of fault.* We do not see how that can be disputed.

We believe appellee's position here is not quite as it has been stated and that it raises a slightly different issue. The term "person" is defined in § 35–11–103(a)(vi), W.S. 1977, in the following manner:

"(a) For the purpose of this act, unless the context otherwise requires:

    *     *     *     *     *     *

"(vi) 'Person' means an individual, partnership, firm, association, joint venture, public or private corporation, trust, estate, commission, board, public or private institution, utility, cooperative, municipality or any other political subdivision of the state, or any interstate body or any other legal entity."

Appellee's position in actuality is that because (1) the pipeline was and is not a person, and (2) the pipeline itself discharged the pollution and altered the river's physical, chemical, and biological properties, § 35–11–301, supra, was not violated. In essence appellee's position is that it should not be held responsible for a breakdown in its equipment. It is on this point that we agree that the statute is unclear.

▪ When a statute is unclear on its face, we must construe the statutory provision in light of the legislative intent. *Sanches v. Sanches*, Wyo., 626 P.2d 61 (1981). Where possible, statutes must be read as the legislature intended. *Department of Revenue and Taxation v. Irvine*, Wyo., 589 P.2d 1295 (1979). Overly-narrow interpretations should not be applied in disregard of an obvious legislative intent for a broader reading. *Nimmo v. State*, Wyo., 603 P.2d 386 (1979).

The legislature's intent often can best be gleaned from a statute's legislative history. *Padilla v. State*, Wyo., 601 P.2d 189 (1979). The Environmental Quality Act was adopted in 1973. It appears in its original form in chapter 250 of the Session Laws of Wyoming, 1973. Section 35–487.49 of ch. 250, is the predecessor to § 35–11–901, supra. That section established the civil penalties which may be imposed for violations of the Act, and is the basis of this suit. As originally adopted, subsection (e), provided:

"(e) Pollution which is a direct result of the malfunctioning or breakdown of any pollution source or related operating equipment beyond the control of the person owning or operating such source or equipment shall not be deemed in violation of this act, provided that prior to the initiation of any action hereunder by the administrators, the owner or operator advises the proper administrator of the circumstances and outlines an acceptable corrective program." Section 35–487.-49(e), ch. 250, Session Laws of Wyoming, 1973.

Clearly that subsection would have exempted from the Act's scope owners of equipment which, through no fault of the owners, broke down and discharged pollution.

Our legislature will not be presumed to have acted futilely. *DeHerrera v. Herrera*, Wyo., 565 P.2d 479 (1977). The inclusion of subsection (e), supra, must be taken as an indication that at that time the legislature did not believe that equipment breakdowns, which resulted in the discharge of pollution, were outside the scope of the Act's other provisions. Thus, but for the exception in subsection (e), the legislature thought the Act had been written to attribute to the owners of equipment liability for the pollution the equipment caused.

However, the clincher is the repeal of that very subsection (e), supra, by the legislature in ch. 14, § 2 of the Session Laws of Wyoming, 1974. The legislature's conduct reveals a definite intent to include within the scope of the Act pollution which results from equipment breakdown and make owners of the equipment liable. It, therefore, would appear that, since the ruptured pipeline in this case was broken down equipment which discharged pollution, the legislature intended the alteration of state waters by the ruptured pipeline to be attributed to the pipeline's owner, appellee.

Also worthy of consideration under the rules of statutory construction is the interpretation placed upon a statute by an agency charged with its enforcement. In the *Matter of Injury of Hasser*, Wyo., 647 P.2d 66 (1982). The Department of Environmental Quality has been charged with enforcement of the Act ever since its passage in 1973. In May of 1978, the Department promulgated Chapter IV of the Water Quality Rules and Regulations (W.Q.R.R.). This chapter prescribed the procedures for reporting and controlling discharges of oil and hazardous substances into the waters of the state. It also stated that a discharge of oil into state waters was a violation of the Environmental Quality Act as well as the regulation. But most importantly it set out that the person owning or having control over the oil or hazardous substances was responsible for the initiation of a cleanup as well as the liabilities, damages or penalties which might ensue from the discharge. Chapter IV, § 5(c), W.Q.R.R.

The legislature has twice amended § 35–11–901, supra, since the promulgation of Chapter IV, W.Q.R.R. See footnote 1, supra. The fact that it has not altered it in order to override the regulation must be taken as a sign it has no quarrel with the provisions of Chapter IV, W.Q.R.R.

Accordingly we believe that the legislature intended the owners of pipelines which discharge oil to be liable regardless of fault for damages and the civil penalties set out in § 35–11–901, supra. We further believe it makes sense to impose upon the owner of a pipeline the monetary loss which results from an oil spill. It is, after all, a cost of transporting the oil, just as much as the purchase of an easement or the pipe, and the wages paid to the employees. As such, it can be passed on, to the extent proper, to those who consume the oil or recovered by any legitimate means available. Such a system of spreading the cost of an oil spill is immensely more fair than requiring only the taxpayers of this state to bear the burden without regard to their actual oil consumption. Therefore, we must reverse the district court since the complaint does allege all the requisites necessary to state a cause of action.

Reversed and remanded for further proceedings consistent herewith.

ROONEY, Justice, dissenting.

I would affirm the district court. I believe that court recognized the necessary boundary line between that authorized and authorizable by the legislature and that authorized and authorizable by the courts. The district judge said in his opinion letter:

"I am frank to say that the State of Wyoming should provide strict liability without regard to causation for the discharge or emission of any pollutant into the waters or upon the lands of this state, * * *."

He went on to recognize the failure of § 35–11–301, W.S.1977, to do so. If he were in the legislature, the district judge would have enacted a strict liability requirement in the premises. But he recog-

nized that a majority of those who were in the legislature had not yet made the same decision.

The decision, one way or the other, would depend upon weighing the preciousness of every drop of water to the state of Wyoming and the need for such to be pollution free against the cold economic facts of everyday life and the importance of national defense requirements. A strict liability statute could result in abandonment of pipelines or of an increase of five or ten cents per gallon for fuel. It could result in a boost to foreign competitors, and, in case of national emergency, the lack of an immediately available supply of necessary fuel for mobilized armed forces. But it could also result in the enjoyment of fishing and other recreational use for coming generations, and it could mean an availability of agricultural products necessary to survival. The point is that these considerations are for the legislature in enacting pertinent laws relating thereto [1] and not to induce the courts to effect that which they might like to have the laws reflect.

Regardless of that which the legislature might do, the plain fact is that it has not as yet imposed the strict liability found by the majority opinion. It did not do so in enacting the Wyoming Environmental Quality Act, § 35–11–101, W.S.1977, et seq. This for whatever reason we need not speculate. As noted by the trial court, §§ 35–11–301 and 35–11–302, W.S.1977, were patterned after the Federal Water Pollution Control Act Amendments of 1972, and the legislative history negates them as a strict liability enactment with reference to unintended oil spills at other than point discharges (enlarged upon infra). *This does not mean that the appellants had no recourse for recovery of penalties and damages*, it only means that fault for the rupture must be established.[2] *Scurlock Oil Company v. Harrell*, Tex.Civ.App., 443 S.W.2d 334 (1969), R.N.R.E.; *Prairie Pipe Line Co. v. Dalton*, Tex.Civ.App., 243 S.W. 619 (1922).

Appellants did not allege the necessary "fault" (be it negligence or willfulness) in their Complaint. They simply alleged that appellee's "pipeline ruptured and discharged" oil into the North Platte River. The district court found that proof of only this fact would not be sufficient for recovery. In this, the district court was correct.

Although the majority opinion applies a liberal construction to the statute, it must be borne in mind that we are concerned with a penal statute.[3] Penal statutes must be strictly construed. *Baker v. Board of Com'rs of Crook County*, 9 Wyo. 51, 59 P. 797 (1900); *Brown v. Jarvis*, 36 Wyo. 406, 256 P. 336 (1927); *Horn v. State*, Wyo., 556 P.2d 925 (1976). Section 35–11–301, W.S. 1977, provides in pertinent part:

"(a) No person, except when authorized by a permit issued pursuant to the provisions of this act, shall:

"(i) Cause, threaten or allow the discharge of any pollution or wastes into the waters of the state;

---

1. It may be that legislative action need not be either black or white. It may opt for a special type of construction for the pipelines when they are over or near streams, or for special and regular inspections of the lines, or perhaps for armed guards to prevent a disgruntled former employee or other motivated saboteur from maliciously breaking the line. Strict liability as established by the majority opinion, makes appellee liable for a break resulting from sabotage or an act of God.

2. As part of its motion to dismiss, appellee moved the court:

"* * * pursuant to Rule 12(b)(7), W.R. Civ.P., for an order either dismissing the Complaint against the defendant, or ordering that an indispensable party pursuant to Rule 19, Wyoming Rules of Civil Procedure, be made a party to this suit. It is claimed that the indispensable party in this action is The Mountain States Telephone and Telegraph Company (Mountain Bell), an entity subject to service of process, in that in its absence complete relief cannot be accorded among those already parties, * * *."

3. The statute contains criminal sanctions. But, even if it contained only civil penalties, strict construction is required.

"* * * Statutes imposing penalties are likewise subject to this rule of strict construction; they will not be construed to include anything beyond their letter, even though it may be within their spirit * * *." 36 Am. Jur.2d Forfeitures and Penalties, § 8, p. 616.

"(ii) Alter the physical, chemical, radiological, biological or bacteriological properties of any waters of the state."

The verbs "cause," "threaten," "allow," and "alter" are words of volition—either in the active sense or in the passive or negligence sense. Standing alone, they could serve to negate the potential for interpretation of strict liability for the prohibited result.

Perhaps this should be sufficient for a holding that strict liability is not imposed by the statute. However, I agree with the majority opinion that the statute, when read with the rest of the enactment of which it is a part, is unclear and ambiguous.[4] The definition of an ambiguous contract is appropriate for the definition of an ambiguous enactment:

" * * * one capable of being understood in more ways than one. * * * obscure in its meaning because of indefiniteness of expression or because a double meaning is present. [Citation.]" *Hollabaugh v. Kolbet*, Wyo., 604 P.2d 1359, 1361 (1980).

Accordingly, as recognized by the majority opinion, we must construe the statute in accordance with the legislative intent.

In this instance, the cause for, and the circumstances surrounding, the enactment of §§ 35–11–301 and 35–11–302 in 1973 make the legislative intent clear and positive. The Federal Water Pollution Control Act had been amended in 1972 to provide for the National Pollutant Discharge Elimination System, i.e., 33 U.S.C. § 1342. This system is a *permit* system. It concerned discharges of pollutants at *specified points*. It made necessary the issuance of a permit by the Administrator of the Environmental Protection Agency before such pollutants could be discharged into the navigable waters of the United States (including the North Platte River). It provided, however, that a state permit system found to be satisfactory by the administrator could op-

erate in lieu of the federal operated system. Sections 35–11–301 and 35–11–302 directly concern water quality. Section 35–11–301, quoted supra, is premised by "except when authorized by a permit." Section 35–11–302 directs that the rules, regulations, standards and permit systems to be issued for the purpose of promoting the purposes of the act "shall prescribe" among other things:

"(v) Standards for the issuance of permits as authorized pursuant to section 402(b) of the Federal Water Pollution Control Act [33 U.S.C. § 1342] as amended in 1972, and as it may be hereafter amended."

Sections 35–11–301 and 35–11–302 concern the issuance of permits for specified points of pollution. They were legislatively intended to satisfy the requirements of 33 U.S.C. § 1342 necessary to accomplish state supervision in lieu of federal supervision of pollution sources. The federal act was in recognition of existing specified points or sources of pollution and the necessity to allow sufficient time to decrease and ultimately eliminate such sources.

"(a) * * *

"(1) it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;

* * * * * *

"(b) * * * It is the policy of Congress that the States * * * implement the permit programs under sections 402 and 404 of this Act [33 USCS §§ 1342, 1344]. * * *" 33 U.S.C. § 1251, p. 107.

The legislature intended §§ 35–11–301 and 35–11–302 to implement 33 U.S.C. § 1342 and to provide that necessary for the state to have primary control over the permit system as a means of decreasing and of ultimately eliminating water pollution. Such sections were not designed to apply to nonintended pollution sources.

4. For example, the prohibition in the statute (§ 35–11–301(a)(ii), W.S.1977) against altering "the physical, chemical, radiological, biological or bacteriological properties of any waters" would ban the placing of a worm or other bait from the end of a line into a stream or pond; it would ban the taking of a fish from a stream or pond; it would ban the exhaust emissions from a motor boat into a stream or pond; and it would ban livestock from stream or pond use. Yet the definition of pollution in the act (§ 35–11–103(c)(i), W.S.1977) anticipates agricultural and recreational use of the water.

"There is no question that the impetus for the act [§§ 35–11–301 and 35–11–302, W.S.1977] and its structure was a direct consequence of the Federal Water Quality Act Amendments of 1972. * * * " (Footnote omitted and bracketed material added.) The Wyoming Water Quality Act and the Federal Water Pollution Control Act Amendments of 1972: A Comparison, Land and Water Law Review, Vol. IX, No. 1, p. 79 (1974).[5]

Also see Ipsen and Raisch, Enforcement Under the Federal Water Pollution Control Act Amendments of 1972, Land and Water Law Review, Vol. IX, No. 2, p. 369 (1974). The timing of the enactment of §§ 35–11–301 and 35–11–302, its obvious purpose to provide state administration in lieu of federal administration, the direct reference in it to 33 U.S.C. § 1342, its predication on a permit system—all reflect the legislative intent for the act to supplement and pertain to that encompassed by 33 U.S.C. § 1342.

Inasmuch as this is so and inasmuch as the federal act referred to does not apply to oil spills or nonintended pollution sources, the Wyoming act similarly does not so apply.

There is a federal act which does impose strict liability for oil spills and spills of hazardous substances, i.e., 33 U.S.C. § 1321. It is entitled "Oil Spill and Hazardous Substance Liability" and was originally enacted in 1970. It provides for cleanup and payment therefor. It provides that the owner may recover its cleanup costs and penalties from third parties causing the spill. A \$35,-000,000.00 fund is established for cleanup if the owner cannot or does not accomplish it. Appellants acknowledged in argument to the trial court that the federal government has proceeded under this act in connection with this spill and that appellee has performed cleanup and has made payments pursuant thereto. Sections 35–11–301 and 35–11–302 were not enacted by the legislature with respect to the Federal Oil Spill and Hazardous Substance Act. They were

not intended to apply to nonintended oil spills and to strict liability therefor. The intention of the legislature in enacting §§ 35–11–301 and 35–11–302 was to implement the permit system, as authorized by 33 U.S.C. § 1342, which has reference to reduction and ultimate elimination of pollution from specific points. It has no application to the oil spill in this case.

The majority opinion attempts to avoid the logic and common sense of the foregoing by attaching to it a label of "undiluted sophistry." The use of a label, however, cannot refute the relationship of the federal legislation with §§ 35–11–301 and 35–11–302, the legislative history of both enactments and the plain wording of the Wyoming enactment, all of which reflect the legislative intent to have the Wyoming enactment apply to a permit system for point discharges. The majority opinion uses twisted reasoning in contending that a statute with a defined purpose may not pertain to only one means of accomplishing the purpose. It reasons that since the purpose of § 35–11–301 is to "prevent, reduce and eliminate pollution" (see § 35–11–102, W.S. 1977), it cannot pertain *only* to permit requirements for point discharges. This reasoning is similar to that which would exist if it were contended that since the purpose of a 55-mile-per-hour speed limit on the highway is to prevent accidents and promote safety, another requirement that vehicles be driven on the right side of the highway cannot exist and that all efforts at safety must be governed by the 55-mile-per-hour speed limit. The federal government has two statutes to accomplish reduction and elimination of pollution: (1) a permit system for point discharges, and (2) a strict liability system (with provisions for costs and penalty recovery and money for cleanups if the owner could not finance, etc.) for spills. Wyoming has a statute, enacted pursuant to terms of the federal permit statute, to reduce pollution by means of a permit system for point discharges. It has not

**5.** Portion by Ted E. Orf of a four-part comment regarding the Wyoming Environmental Quality Act of 1973.

yet enacted a strict liability statute for spills. It is not the province of the courts to do so. It is the legislature's province to decide if such should exist.

The majority opinion slides into an argument premised upon the "malfunctioning or breakdown" of appellee's equipment. There is absolutely nothing in the record to reflect such occurrence. If the complaint had hinted of such, it probably would not have been dismissed. Argument directed at this strawman is irrelevant.

A final comment must be made relative to imposition of strict liability in a penal statute. Normally, general intent is required as an element of a crime. In other words, the act must be done voluntarily. *Slaughter v. State*, Wyo., 629 P.2d 481 (1981); *Dorador v. State*, Wyo., 573 P.2d 839 (1978). Although the legislature may make an act criminal without knowledge or intent of the actor, the legislative intent to do so must clearly appear.

> "Generally speaking, when an act is prohibited and made punishable by statute only, the statute is to be construed in the light of the common law and the existence of a criminal intent is to be regarded as essential, although the terms of the statute do not require it. * * *" *State v. Shedoudy*, 45 N.M. 516, 118 P.2d 280, 285 (1941).

See *People v. Stuart*, 47 Cal.2d 167, 302 P.2d 5, 55 A.L.R.2d 705 (1956). The legislative intent to impose strict liability for oil spills does not clearly appear in § 35–11–301. The silence of the statute with reference to the element of knowledge or intent certainly does not satisfy the requirement that such must clearly appear. Thus, knowledge or intent is a necessary element of the offense.

Under the present status of Wyoming law, the decision of the district court should be affirmed.