[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The commissioner of environmental protection has brought this action to recover civil penalties from the defendant pursuant to22a-438 (a) of the General Statutes based on her claim that one of the defendant's lavatory waste trucks discharged airplane lavatory wastes onto the ground at Bradley International Airport on October 4, 1988 and October 15, 1988 in violation of General Statutes22a-430 of the water pollution control act which prohibits such a discharge without a permit issued by the commissioner.
The defendant's answer denied the plaintiff's claim of illegal dumping and asserted as a special defense (4) that if any such discharges occurred as alleged in the complaint, they were in violation of the company's policy (1) "prohibiting unlawful discharges of septic effluent from its aircraft lavatories or its lavatory service vehicles." It also alleged (5) that "no employee of the defendant was authorized" to engage in such conduct and that if one of them did so, American Airlines had not violated the statute because (6) "such employee was acting outside the scope of his or her employment and not as an agent of the defendant or in furtherance of the defendant's business."
The factual circumstances leading up to the two incidents which are the subject of this action are essentially undisputed and may be summarized as follows by way of background. The defendant's operations at Bradley International Airport (Bradley) include the collection of airplane lavatory wastewater by means of so-called "lavatory services carts" which are trucks with holding tanks that the airline's employees use for the loading, transportation and unloading of lavatory wastes.
Prior to June of 1988, these wastes were emptied from the trucks at the "triturator" building or sewage disposal plant on Cargo Road at the airport. The plant was closed down from June to November of 1988, and during that period the airlines operating out of Bradley arranged for the disposal of their aircraft lavatory wastes by the ABC Septic Tank Service (ABC), a contract septic waste hauler.
The transfers of the contents of the lavatory service trucks to ABC's tanker took place in an area near the triturator building in the early evening between 6:30 p. m. and 7 p. m. Under the CT Page 2369 contractual arrangement between the airlines and ABC, a fixed fee that was not based on actual usage was paid by each airline to ABC and in that respect there was no financial benefit to the airline itself if it did not use the hauler's services on any particular day.
The only witness for the plaintiff as to the first incident was John Taylor, an employee of ABC, who testified that as he was leaving after servicing the airlines' lavatory waste trucks on the evening of October 4, 1988, he saw an "older" waste truck with an American Airlines logo enter the waste transfer area. He went back and saw that the truck had parked and that the driver was in back of the truck draining its contents onto the ground.
He stated that he could not identify the operator of the truck because "different people drove the trucks." He also acknowledged that he did not report the incident to the police until October 18th because he had forgotten about it.
He also testified about another incident involving an older American Airlines truck which did not have a safety valve to shut off the flow of sewage. On that occasion, after he and his father had hooked the hose to their vehicle, they were both doused with sewage while trying to bring the hose back to its upward position.
Robert Carterud, supervisor of plumbing facilities and operations at Bradley, testified that during the week of October 10th there were four to six reported dumping incidents at the triturator site and that "they were keeping an eye out for possible violators" at that time. On the evening of October 15th, as he drove past the area at about 6:30 or 6:45 p. m., he saw an American Airlines lavatory service truck parked there and a person standing on top of the vehicle.
James R. Turner, a state police sergeant, arrived at the scene shortly thereafter and found Trevor Samuels, an employee of American Airlines, in the truck. One of Samuels' duties as a fleet service clerk for the defendant was to transfer lavatory wastes from incoming planes into one of American's lavatory service trucks, and then drive the truck to the area where the police officer found it parked so that the waste tank could be emptied by transferring its contents to the ABC tanker truck.
Sergeant Turner testified that although the tank itself was virtually full and there was no direct evidence that any substantial portion of its contents had been drained, or that Samuels had drained it, his observations of the truck and the surrounding area led him to believe that at least some waste water had escaped or had been released from the tank a short time before. His observations, which were supplemented by photographs that he had CT Page 2370 taken at the scene which were marked as exhibits, included the fact that there were wet spots on the back of the truck from liquid spattering, the drain plug cap was off the pipe, and the ring at the top of the pipe was wet.
When the police officer first arrived at the scene, he saw a bluish liquid sinking into the ground (Plaintiff's exhibit D3) which had the same odor and appearance as the lavatory wastewater in the tank. His examination of the truck also showed that although the vehicle was standing in a wet area, the sides of the tires were dry indicating to him that the truck was parked and stationary before the spillage occurred.
The servicing record of the truck which was introduced in evidence by the defendant (Exhibit 8) shows that the dump tank was "leaking over left wheel well [and was] patched with fiberglass" on July 18, 1988. Herbert Kelsey, an employee of the defendant who had been a fleet service clerk in October of 1988, testified that it was the oldest lavatory waste truck in use at Bradley at the time, that its tank was starting to rot out, and that it was permanently taken out of service in November of 1988.
Trevor Samuels was called as a witness by the plaintiff and identified the truck shown in the police photographs as the one that he was operating on the evening of October 15, 1988. He testified that he was parked in the waste transfer area waiting for the ABC truck, that he was never on top of the truck, and that no sewage was drained from the truck while he was parked there.
James Greier, a sanitary engineer for the department of environmental protection, was called by the plaintiff and testified that sewage that is discharged or spills on the ground seeps into the water table and that human wastes, as well as the odor masking chemicals used in airplane lavatories, may pollute wells and other water sources and create a public health hazard. He also stated that no permit had been issued by the plaintiff to allow such discharges and that the cleanup cost for the spillage was $436.00.
The defendant offered evidence to show that if Trevor Samuels had been the person who was seen on top of the truck that evening or if he had been caught in the act of draining the tank onto the ground, his clothing would have become covered with sewage or would have shown at least some signs of being doused by the wastewater in the tank. However, none of the witnesses, including Sergeant Turner, who observed him at the scene testified that his clothes were soiled.
David Stillwagon, the defendant's general manager at Bradley, testified that the company's rules for employee conduct provide CT Page 2371 that "[a]ny action constituting a criminal offense . . . will be grounds for dismissal." Defendant's exhibit 6, Employee HandBook, Rule 34. He stated that his interpretation of that rule would be that it would apply to an employee who was seen dumping waste on the ground and that he would recommend that any such employee be fired.
The defendant's post-trial brief presents essentially two arguments on the question of liability, first, that the plaintiff has failed to prove the second violation charged, namely, that Trevor Samuels discharged sewage from his truck on October 15, 1988, and, second, that in any event, even if she has proved that lavatory waste was illegally dumped from an American Airlines truck on both occasions as alleged in the complaint, the employee involved could not have been acting within the scope of his employment because his conduct was prohibited as a matter of company policy.
In general, state environmental protection statutes which impose civil penalties do not refer to the actor's state of mind nor do they require a finding of intent to violate the law and liability is established when the state has proved that the prohibited act was performed. State Department of Environmental Protection v. Lewis, 522 A.2d 485, 489 (N.J.Super. A.D. 1987). Statutory prohibitions against the discharge of effluents are a form of strict liability and do not require proof of fault or proof of intent, nor is the good faith of the party charged with the violation a defense to liability under such a statute. United States v. Amoco Oil Co., 580 F. Sup. 1042, 1050 (W.D.Mo 1984).
The criminal standard of proof beyond a reasonable doubt does not apply where civil penalties are being sought, and in such cases "the Government need only prove liability by a preponderance of the evidence . . .". Tull v. United States, 481 U.S. 412 at 428 (Scalia, J., concurring in part and dissenting in part).
The testimony of witnesses that they saw trucks bearing the company's logo discharging waste material without a permit to do or at an unlicensed waste facility and that the drivers were employed by the company is sufficient to warrant a finding that the state's environmental protection act had been violated by the corporate owner of the vehicles that were engaged in the prohibited activity. Slager v. Illinois Pollution Control Board,421 N.E.2d 929, 931 (Ill.App. 1981); see also Bliss v. E.P.A.,485 N.E.2d 1154, 1156 (Ill.App. 1985).
The defendant argues in its brief (p. 21) that the plaintiff's evidence as to the first incident is insufficient because it is "based solely upon the unsubstantiated and, at least initially, CT Page 2372 unreported observations of John Taylor." However, counsel for the defendant in his cross examination of Taylor failed to establish, or even to suggest for that matter, a possible motive for him to fabricate his account of what he observed on the even: of October 4th.
The court finds no reason to disbelieve Taylor's testimony about the first incident and concludes that the commissioner has sustained her burden of proving that an employee of American Airlines discharged lavatory waste onto the ground on October 4, 1988, as alleged in the complaint.
The evidence as to the second incident, on the other hand, based entirely on circumstantial evidence, and the defendant has devoted a substantial portion of its brief to formulating a reasonable hypothesis of "innocence" based upon its view of the evidence which might well persuade a trier of fact, based on the standard of proof in a criminal case, that a reasonable doubt exists as to the culpability of Trevor Samuels. However, the plaintiff's burden in this case is to prove her case by the civil standard of proof by a preponderance of the evidence that the violation occurred, and the court therefore concludes that she has satisfied her burden of proof under that standard based upon all of the credible evidence in the case.
The theory of the defendant's special defense is that vicarious liability may not be imposed on an employer for employee conduct which has been expressly prohibited as a matter of company policy because by engaging in such conduct the employee would be acting outside of the scope of his employment "and not as an agent of the defendant or in furtherance of the defendant's business." 6. The defendant's argument is not a correct application of the principle of respondeat superior which is not based on agency principles but on public policy which requires that the employer should be held responsible for the acts of those who work for him, "done in and about his business, even though such acts are directly in conflict with the orders which he has given them on the subject." Stulginski v. Cizauskas,125 Conn. 293, 296.
Theoretically as well as practically, the master's responsibility for the negligence of his servant extends far beyond his actual or possible control over the conduct of the servant. Wolf v. Sulik, 93 Conn. 431, 436. "It rests on the broader ground that every man who prefers to manage his affairs through others, remains bound to so manage them that third parties are not injured by any breach of legal duty on the part of such others while they are engaged upon his business and within the scope of their authority." Id. 436-37. CT Page 2373
The fact that the employee disobeyed the orders of the employer is never a sufficient defense because if such disobedience, which is easily proved, were to exonerate the employer, it would virtually do away with the respondeat superior rule. Son v. Hartford Ice Cream Co., 102 Conn. 696, 700-01. If private instructions or company rules given by the employer could relieve him from liability he could avoid all liability for the acts of his employees by simply instructing them not to commit such acts or to engage in such conduct. 53 Am.Jur.2d, Master 
Servant 435.
When the servant is doing or attempting to do the very thing which he was directed to do, the master is liable, though the servant's method of doing it was wholly unauthorized or forbidden. Son, 102 Conn. 700-01. As long as the employee continues to go about the business of the employer and adopts methods which he deems necessary, expedient or convenient and the method he uses prove harmful to others, the employer is liable. Mason v. Down Town Garage Co., 53 S.W.2d 409 (Mo.App. 1932).
Applying these principles to the facts of this case, the unidentified driver of the truck that John Taylor observed on October 4th, and fleet service clerk Trevor Samuels on October 15th, were doing or attempting to do the very thing that it was their job to do, namely, to empty the lavatory truck at the location where that task was usually performed. The fact that instead of using the approved procedure of transferring the contents of the tank to the ABC truck they used a method which was wholly unauthorized, but which they deemed necessary, expedient or convenient at that time, does not exonerate the defendant from liability for their acts.
Whether or not an employee is acting within the scope of his employment is ordinarily a question of fact for the trier who may properly consider the situation as it appeared to the employee at the time and place in question. DeNezzo v. General Baking Co., 106 Conn. 396, 399-400. One such consideration is whether his unauthorized conduct is similar to or incidental to the conduct authorized. Hickson v. Walker Co., 110 Conn. 604, 611.
The rule of respondeat superior is in effect one of strict liability whose modern rationale is particularly applicable to the enforcement of environmental protection laws. That rationale is that the employer's liability should extend beyond its actual or possible control over its employees to include risks inherent in or created by the enterprise because the business entity rather than the general public or the offending employee is best able to assume the economic costs that flow from such conduct. Rodgers v. Kemper Construction Co., CT Page 2374 124 Cal. Reptr. 143, 148 (Cal.App. 1975). A risk is inherent in, or created by, an enterprise where viewed in the context of its business operations the employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business. Id. 149.
This economic cost analysis was applied under a statute very similar to 22a-430 of our water pollution control act against the owner of a ruptured oil pipeline. People v. Platte Pipe Line Co., 649 P.2d 208 (Wyo. 1982). The court held that since the ruptured pipeline was "broken down equipment which discharged pollution," the legislature intended that the economic consequences of the resulting oil spill should be borne by the owner of the pipeline rather than by the taxpaying public. Id. 214.
For all of the foregoing reasons, the court finds that the defendant violated 22a-430 of the General Statutes by discharging liquid waste without a permit on October 4, 1988 and October 15, 1988 as alleged in the complaint and is therefore subject to civil penalties under 22a-438 (a).
The court in its assessment of the appropriate penalty has considered the various factors which should guide this court in the exercise of its discretion as stated in Carothers v. Capozziello, 215 Conn. 82, 103-04. The factors that weigh most heavily in favor of the defendant are its "good faith efforts to comply with applicable statutory requirements" and the lack of "any apparent economic benefit gained by the violations [and] the fair and equitable treatment of the regulated community." Id.
Accordingly, the court imposes a penalty of $2,500 for the violation of October 4, 1988 and a penalty of $1,000 for the violation of October 15, 1988, as well as the cleanup cost of $436.00 pursuant to 22a-6a of the General Statutes.
Hammer, J.